## WILLIAM S. SMITH, Respondent, v. MISSOURI AND KANSAS TELEPHONE CO., Appellant.

**Kansas City Court of Appeals, May 8, 1905.**

1. **NEGLIGENCE: Electricity: Erection: Storms.** A telephone company in erecting its poles should consider the probable results of usual elemental action, such as normally severe storms and any construction that will not withstand them is not reasonably safe.

2. ———: ———: ———: **Approximate Cause.** Where a negligently erected pole wrenched from their bearings two heavily charged electric railway wires, resulting in the wires burning in two and the ends dropping to the ground, the fact that the loose wires may be wrapped around adjoining poles and thereafter a lineman is thrown from one of these poles by reason of a shock possibly caused from the wrapping of these wires, will not relieve the company setting the negligent pole from liability to the lineman, since the negligently erected pole first turned loose the death dealing power and is the approximate cause of the shock.

3. **APPELLATE PRACTICE: Evidence: Instruction: Verdict.** Where issues are submitted on the evidence and proper instructions the verdict is final in the appellate court.

4. **NEGLIGENCE: Electricity: Live Wires: Contributory Negligence.** The evidence reviewed and held sufficient to send the cause to the jury on the negligence of the defendant and the contributory negligence of the plaintiff.

5. ————: **Evidence.** Evidence of a witness who, two months after the injury, examined the condition of a pole, is held properly submitted to the jury since the connecting evidence shows the condition at the time of the accident and two months thereafter to have been substantially the same; and evidence relating to the condition of the wires after the accident is also held admissible.

6. **EVIDENCE: Expert Witness: Instruction.** A court should define the nature of expert testimony, and an instruction set out in the opinion is approved as properly informing the jury that such testimony does not tend to prove the facts on which it is based and does not bind the jury.

Appeal from Buchanan Circuit Court.—*Hon. A. M. Woodson,* Judge.

AFFIRMED.

*Thomas F. Ryan* for appellant.

(1) The court erred in permitting the plaintiff to testify as to the condition of the pole and its surroundings two months after the accident. (2) The court erred in permitting the witness, Lucas, to testify as to the condition of the pole and its surroundings two weeks after the injury. (3) The court erred in admitting the testimony of the witness, Ellis, as to the condition and situation of the wires after the injury to plaintiff, as the evidence showed that the condition of the wires had been changed. (4) Before this class of testimony is ever admitted it must first be shown that the condition and situation were the same as at the time when the injury occurred. Hipsley v. Railroad, 88 Mo. 348; Alcorn v. Railroad, 108 Mo. 81; Ely v. Railroad, 77 Mo. 34. (5) The court should have given the demurrer asked by the defendant at the close of plaintiff's case and at the close

of all the evidence in the case. (6) We respectfully submit that the facts not only show that the plaintiff was guilty of contributory negligence, but it shows that the plaintiff was wanton and reckless in his conduct, and had no regard for his own safety, and is not entitled to recover and the demurrer should have been sustained. Junior v. Power Co., 127 Mo. 79; Wray v. Power Co., 68 Mo. App. 380; Epperson v. Cable Co., 155 Mo. 346; Roberts v. Tel. Co., 166 Mo. 370. (7) Under the law verdicts must be founded upon evidence and not upon mere conjecture, and it devolves upon the plaintiff to furnish this evidence, which he failed to do. Moore v. Railroad, 28 Mo. App. 626; Peck v. Railroad, 31 Mo. App. 126; Glick v. Railroad, 51 Mo. App. 95. (8) Where the evidence tends to show that an accident occurred in any one of two or more ways, one which renders defendant liable and the other does not, the burden of proof is upon the plaintiff to show that it occurred in the manner which renders defendant liable. Oglesby v. Railroad, 177 Mo. 272; O'Malley v. Railroad, 113 Mo. 325; Glick v. Railroad, 57 Mo. App. 105; Perkins v. Railroad, 103 Mo. 52; Peck v. Railroad, 31 Mo. App. 125; Moore v. Railroad, 28 Mo. App. 625; Hays v. Railroad, 97 N. Y. 259; Railroad v. Shertle, 97 Pa. St. 450. (9) Plaintiff having failed to prove the negligence charged in its petition, the demurrer should have been sustained on this point. We think this position is fully supported by the following authorities: Gurley v. Railroad, 93 Mo. 449; Bank v. Armstrong, 62 Mo. 59; Zentz v. Chappell, 103 Mo. App. 214; Haines v. Pearson, 100 Mo. App. 555; Aston v. Transit Co., 105 Mo. App. 226; Hite v. Railroad, 130 Mo. 132; Chitty v. Railroad, 148 Mo. 64; Feary v. Railroad, 162 Mo. 96; Rubber Co. v. Water Co., 181 Mo. 678; Hesselbach v. St. Louis, 179 Mo. 519. (10) The court erred in giving instruction numbered 4 for plaintiff. Rodgers on Expert Testimony, secs. 37, 39 and 41, p. 58, 61 and 64; 8 Ency. Plead.

and Practice, sec. 7, p. 774; Wood v. Railroad, 181 Mo. 445; Hampton v. Massey, 53 Mo. App. 501; Thompson v. Ish, 99 Mo. 179; Price v. Ins. Co., 48 Mo. App. 281; Light Co. v. Ins. Co., 33 Mo. App. 349; Carter v Baker, 1 Sawyer (U. S. C. C.) 512-525; Cuneo v. Dessoni, 63 Ind. 524; State v. Hinkle, 6 Iowa 380; Wood v. Sawyer, Phillip, (N. C. Law), 253-276; Fairchild v. Bascomb, 35 Vt. 398, 405; In re Springer, 4 Penn. Law 275.

*W. K. Amick* for respondent.

(1) The condition of the earth about the base tended to show whether the top of the pole had moved. On one side the earth was heaved up, on the other side you could put your hand down between the pole and the earth. This evidence was competent. (2) The testimony as to the condition of the primary wires within an hour or two of the accident was competent even though the ends of the wires were wrapped around the pole. (3) The petition pleads all the facts as they were proven. (4) There was no evidence of any intervening cause to produce the injury. (5) The demurrer should not have been given. It was not negligence to take hold of the primary wire even if it had been bare. The current could not pass on to his body while he had hold of the primary unless he was in contact with another wire that was grounded or carried a current so as to put himself in the circuit. The city wire was not grounded. Defendant recognized this and submitted that question in its instructions 2, 3, 4, 5 and 6. Geisman v. El. Co., 173 Mo. 678; Illingsworth v. Light Co., 161 Mass. 583; Melville v. El. Co., 70 N. E. 1052. (6) Plaintiff's instruction numbered 4 on expert testimony is correct. It first defines what is an expert witness; then says that expert testimony is the opinion of such a witness based upon the facts proven. The jury are not bound by expert testimony. Hull v. St. Louis, 138 Mo. 625-627; Railroad v. Fowler, 142 Mo. 688; State v. Darrah, 152 Mo. 532, 542;

Kingsbury v. Joseph, 94 Mo. App. 305; Meyers v. Realty Co., 96 Mo. App. 630; Gaslight Co. v. Ins. Co., 33 Mo. App. 371; For a full discussion see note to 42 L. R. A. 573.

JOHNSON, J.—Action for damages for personal injuries consequent to a fall from the top of a telephone pole where plaintiff, a lineman, was engaged in making certain repairs. Negligence on the part of defendant it is charged, was the producing cause of the fall. Plaintiff recovered judgment in the sum of three thousand dollars. No complaint is made of an excessive verdict but defendant asks a reversal because of errors claimed to have been committed during the progress of the trial, first among which was the overruling of its demurrer to the evidence.

The injury occurred September 8, 1903, in the city of St. Joseph. At that time the city was operating its own system of public lighting generating and using electricity for that purpose. The business of producing and supplying electricity for private use, either as power or for lighting was conducted by the street railway company. Defendant was operating a telephone exchange. All three corporations used the public streets for their lines of wire—strung upon poles—which carried the power to the various points of use throughout the city. The currents of electricity carried through the streets by the city and railway company being highly potential, the wires through which they flowed were insulated, and in many instances strung upon the same line of poles— defendant employing none but currents of low power used in their transmission bare wires carried upon its own pole lines. The pole from which plaintiff fell was situated on the east side of St. Joseph avenue at its intersection with Park street. It belonged to the city, but was in a line jointly used by the city and the railway company for the carriage of wires. This line came from the south from where the power was generated and pass-

ed along the east side of St. Joseph avenue to and beyond Broadway street. The wires carried by it with which we are concerned consisted of two used by the railway company in the transmission of currents of elecity for private use, termed in the evidence "primary wires," and one used by the city in feeding its arc lamps, called the "city wire." As the negligent act complained of is said to have occurred upon this line at or near Broadway street some six blocks north of the place of injury it is important, in reviewing the action of the court in overruling the demurrer, to understand the details of the situation at that point; and we will select as the focus of observation a certain pole, a unit in this line located at a point where the highway slightly deflects in is course. This pole is called in the evidence the "railway pole" and before the accident carried on the eastern projection of two cross arms the two "primary wires" and the "city wire" referred to. On the opposite side of the avenue was situated an important lead in defendant's telephone system which consisted of a heavy pole line provided with cross arms and pins sufficient to support and carry fifty wires. Coming from the south to the "railway pole" the direction of the avenue was east of north. Shortly before reaching the pole it curved somewhat sharply to the left until, pointed due north, it proceeded in that direction upon a tangent. The telephone lines following the course of the street, curved to the left at the point opposite the railway pole.

In order to strengthen the resistance of the telephone pole located in the curve to the strain imposed upon it by the weight and tension of taut wires, defendant set a guy pole about one foot north of the "railway pole" and from the top thereof ran a tightly drawn wire across the street to the telephone pole securely fastened to the tops of both poles and of sufficient strength to hold the telephone pole in place provided the guy pole retained its position. This was attempted to be secured by run

ning a tightly drawn wire attached to the top of the guy pole and to an anchor planted in the ground some twenty-five feet east of the pole, the idea being that with such construction the telephone pole could not incline westward without drawing with it the top of the guy pole which could not be moved in that direction without the extraction of the buried anchor from its position. The first pole in line south of the "railway pole" was about twenty-five feet distant therefrom and carried on its top a lamp fed by the "city wire." There was but one cross arm attached to this pole but the "city wire" was looped into the lamp above from the opposite ends of a smaller cross arm attached to the other at a right angle thereto, thus preserving in the passage of the wire in and out of the lamp the line of its course. The position of this wire on the cross arms was immediately east of the "railway" and "city" poles; to the east thereof at intervals of about ten inches were the two "primary" wires. Up to this point there is no dispute over the facts. The differences all relate to those we are about to detail; and with respect to them we shall adopt plaintiff's version in the consideration of the demurrer.

The guy pole had been in position for something less than two months. It is claimed that while at its base it was in line with the other poles, it was raked to the east when set so that its top was approximately three feet east of its base and cleared the outside "primary" wire; but owing to the negligent manner in which it was set, the top had been pulled west and north until the west perpendicular line of the pole was on a line with the pins carrying the intermediate "primary wire," with the result that sometime shortly preceding the accident the outside primary wire, owing to the great pressure exerted upon it by the guy pole, tore out its fastenings from the cross arms on the "railway" and "city" poles and was thrown across the "city wire" upon its individual cross arm on the "city" pole, and also across

the other "primary wire" at a point some five feet south of the railway pole. This latter contact resulted in the generation of sufficient heat to melt both "primary" wires. Their parted ends dropped to the ground, after which the contact between the "primary" wire and the "city wire" at the city pole continued. It appears from some of the evidence that the insulation was old and defective on all of these wires. The negligence in the setting of the guy pole appears from the following facts:

The length of the pole was some thirty-five feet. It was set in the ground about five and one-half feet. The anchor, a piece of pole five or six feet long, was buried to a depth of about five feet. It was not placed upon a prolongation of a line drawn from the telephone pole to the guy pole but from six to eight feet north of such imaginary line, so the wire connecting the tops of the two poles and that connecting the top of the guy pole to the anchor formed two sides of an obtuse triangle with the guy pole at their intersecting point, the third side—the one opposite to the angle—being an imaginary line drawn from the telephone pole to the anchor. The result of such construction imposed upon the guy pole a pulling strain northward against which the anchor offered no counteracting force and which, when yielded to, relaxed the tension of the connecting wire between pole and anchor and afforded response by the guy pole to the westward pull of the telephone pole. After the accident it was found that the top of the guy pole inclined northward about three feet. It no longer raked to the east but stood in a perpendicular line east and west. As an indication that the pole had yielded to the strain upon it, the ground to the west of its base was found pushed upward and outward, while to the east there was a space between the pole and earth into which a man's hand could be inserted readily.

The night preceding the accident a storm of some severity occurred, which blew down some few telephone

poles in different parts of the city and caused other damage requiring repair work to be done the next day. The wires on the "city" pole at Park street were affected and plaintiff—employed by the city—was sent up the pole to make necessary repairs. In taking position to work, he rested one foot on an iron step and threw the other over the cross arm. Finding one of the "primary" wires interfering with his position, he seized it with his hand in order to remove it out of the way. At that instant, his foot slipped slightly on the step, causing his body to swerve into contact with the "city" wire thereby forming a connection between the two wires through the medium of his arm and body. A shock followed of sufficient intensity to burn his hand and shoulder at the points of contact and to deprive him of consciousness. He fell from the pole a distance of some twenty-five feet. The city lamps on this line were upon what is called a metallic circuit; that is, the electric fluid which fed them traveled its entire course upon wires without coming into contact with the earth. In fact, a "grounding" of the circuit at any point would change the course of the current from the wire running through the lamps to the earth, for the latter medium offered less resistance than the lamps—and an electric current travels the line of least resistance. It therefore was essential to the operation of the lamps to keep the circuit free from terrestrial communication. The "primary" wires were upon what is called a ground circuit; that is, the current was carried to the end of the line upon a wire and there connected with the earth, through which it returned to the place of generation; but in case the wire at any intermediate point was brought into connection with the ground by any good conductor of electricity, the current would use the shorter line of travel thus established. And, also, it appears to be a law of some importance in this case that when wires of two parallel circuits carrying different currents, the one high and the

other low in potentiality, are brought into contact the high current will overflow into the low in an effort to equalize the two. It will thus be seen—keeping in view these principles—that notwithstanding plaintiff received his shock between the city pole at Broadway and the power houses, if the wires, or any of them which formed a part of the three different circuits, became grounded, and the city wire formed a contact with either of the primary wires, the plaintiff, in acting as a conductor between the city wire and one of the primary wires, would receive a severe shock, as the primary wires carried currents of 1,000 and of 500 volts, respectively. The city wire at the time of injury carried no current, the lamps being used only at night.

Thus, it appears a complete chain of facts connects defendant's negligence in the setting of the guy pole with the injury to the plaintiff. We do not understand it to be denied by defendant that such causal connection has been shown by plaintiff's evidence. It is at least tacitly admitted that plaintiff's shock could have been produced as the result of the breaking of the primary wires at Broadway and their intermingling with the city wire, as above described. But defendant says that other causes for which it would not be liable could have produced the shock, independent of the negligent act charged, and that the jury necessarily was compelled to speculate in the selection of defendant's negligence as the proximate cause.

It is pointed out that the storm of the previous night was of great violence; that much damage to poles and wires resulted therefrom, and that the break at the railway pole could have resulted from elemental action. It is not shown that any pole or tree or other object was thrown against the line at any point near the "railway" pole, nor does any other fact appear which indicates that the storm alone was responsible for the damage. It seems highly probable that the wires were torn loose

during that disturbance, but nothing else can be pointed to as the cause of the charging of the city wire with currents drawn from the others but the strain imposed upon the primary wire by the guy pole. It was the duty of the defendant in erecting that pole to take into consideration the probable results of the usual elemental action. It is not enough to exonerate it from blame to show that the guy pole as it stood was a safe construction in fair weather. Severe storms are a normal condition and any construction is not reasonably safe and cannot be denominated the result of proper care that will not withstand them. Defendant's evidence does not show that the storm was of overpowering violence such as could not be guarded against by ordinary foresight; while plaintiff's evidence is to the effect that it was not of unusual severity. Under all the facts shown, it is reasonable to infer that the impact of the wind coming from a westerly direction against the heavily loaded telephone line bent it eastward, thereby slackening the strain upon the guy pole wire, the resilient reaction of the telephone line following the cessation of the wind tightened the guy wire with violent force, which, being communicated to the loosened guy pole jerked it forward upon the primary wire with force sufficient to tear it from its moorings.

The storm cannot be considered under the evidence as a sole producing cause of the damage but rather as a condition which accelerated the natural result to be expected from the negligent construction. Also, it is urged that the negligence of some unknown person may have caused the cross between the primary and city wires, existing at the time of injury. It appears that some one had wrapped the loose ends of the broken primary wires around the city pole, probably before plaintiff received his shock. Evidently, this was done to prevent injury to people upon the street. But it is not shown, nor does it

appear in any manner, that this act affected the position of the wires upon the cross arm above.

We do not feel justified in resorting to conjecture, as would have to be done should we infer that the contact of the wires above mentioned resulted from that act. But assuming, for argument, that the wires were negligently wrapped around the pole, and thereby brought together on the cross arm, we cannot adopt defendant's conclusion that such act would lift the burden of responsibility for plaintiff's injury from defendant. The danger was produced by the parting of the primary wires, the direct result of defendant's negligence. The loosened ends of these heavily loaded wires, darting here and there upon the ground in a public highway, threatened any one who happened to be there with serious injury —even with death. It was a work of imperative necessity to confine the danger as far as possible. Under such circumstances, the negligent act which first turned loose the death dealing power must be held to be the proximate cause of any injury resulting therefrom—not the acts of those who, in attempting to limit its sphere of operation, diverted its course, thereby aiding in the infliction of damage in an unanticipated quarter.

Other producing causes presented for consideration —one that the cross arm on the "railway" and "city" poles gave way because of their unsound condition, and another, that the pole from which plaintiff fell had been saturated with water from rainfall to the extent that it became a good conductor of electricity, and as such, together with plaintiff's body, formed the connecting medium between the primary wire and the ground—may be dismissed with the observation that they are predicated entirely upon defendant's evidence, and are contradictory to the facts brought out by plaintiff.

These issues, therefore, were settled by the verdict of the jury so far as we are concerned.

Finally, it is urged the demurrer should have been

given on the ground that plaintiff was guilty of contributory negligence under the facts disclosed by his evidence. We think under the facts this issue was for the jury to decide. It is claimed plaintiff should have worn rubber gloves in handling high power wires, also should have made a test to ascertain if the city wire was charged, and should not have relied upon the supposition that no current was upon it. But it is shown in answer to this that there is no danger in handling live wires when the body is not in position to connect them with other charged wires, or with the ground, and that a telephone pole being a poor conductor, will not aid in grounding a current. Also, it appeared that while plaintiff believed the "city" wire was "dead," he acted upon the contrary assumption and did not voluntarily come into contact with it. The closing of the circuit by his body was purely accidental, being caused by the slipping of his foot. His failure to test the city wire was immaterial under the facts stated by him, which, in the consideration of the question before us, we must accept, and which sustain his assertion that he treated the city wire as one charged with a current.

Under the views expressed we must hold no error was committed in overruling the demurrer.

Objections also are made to the rulings upon the admission of evidence. Plaintiff was permitted to testify relative to observations of the guy pole made by him two months after the accident, particularly with reference to the condition of the ground at its base. Another witness also was permitted to testify to the condition existing there two weeks after the accident. Both witnesses testified to the same condition: that is, that on the west the ground was pushed up, and on the east there was a space between the earth and pole. The materiality of the evidence is made manifest by the sharp conflict between the parties relative to the manner of setting the pole. Plaintiff's witnesses contended that it was raked

eastward a sufficient distance to clear both "primary" wires and altered its position, as before detailed, while defendant claimed that the pole was set upright between the two "primary" wires, and that its position never changed. It will be observed that all agree upon the position of the pole at the time of injury. Assuming defendant's claim of no change in position, the ground at the base of the pole would have remained undisturbed; while if plaintiff was right in saying the top had shifted to the west, the earth at the base would show the conditions described by him and his other witness. The fact the evidence of both parties shows that the position of the top of the pole was the same two months after the accident that it was two weeks thereafter, and at the time thereof, furnishes the connecting proof that the condition of the ground at its base was the same at all three periods, and left it a matter for the jury to say which of the two conditions described existed. The rule followed in the cases of Hipsley v. Railroad, 88 Mo. 348; Alcorn v. Railroad, 108 Mo. 81, and Ely v. Railroad, 77 Mo. 34, cited by defendant, does not apply. It goes no further than to prevent proof of a subsequent change of construction being received as bearing upon the fact of negligence. Here, the evidence was offered for the purpose of proving an unchanged condition which existed at the time of injury. It is not to be inferred we are holding that such evidence may be received without connecting proof, but we are deciding that such proof was shown.

The evidence relating to the condition of the wires shortly after the accident also was admissible. Under the views herein expressed, the fact of the wrapping of the primary wires around the city pole did not deprive such evidence of probative force. Without further comment on this branch of the case, we say there was no substantial error in the action of the court in passing upon questions of evidence.

We find the issues bearing upon the fact of negligence were fairly submitted in the instructions and that no variance exists between the negligent act alleged and that proven and submitted. Our comment upon the instructions will be confined to the following, given on behalf of plaintiff:

"An expert witness is one who is skilled in any particular art, trade or profession, being possessed of peculiar knowledge concerning the same, acquired by study, observation and practice. Expert testimony is the opinion of such a witness, based upon the facts in the case as shown by the evidence, *but it does not even tend to prove any fact upon which it is based, and before you can give any weight whatever to expert testimony you must first find from the evidence that the facts upon which it is based are true.* The jury is not bound by expert testimony but it should be considered by you in connection with the other evidence in the case."

The italicized words are objected to as containing an improper definition and prejudicial direction, the harmfulness of which, it is urged, is emphasized by the fact that some of defendant's witnesses from whom opinion evidence was elicited also gave testimony upon basic facts. Generally speaking, the opinion of a witness who, by reason of his training and experience in a given art, profession or trade, possesses superior knowledge to that enjoyed by others is received for the purpose of aiding the triers of fact in reaching a conclusion upon an ultimate fact, not susceptable of direct proof, but deducible from proven facts. For the purpose of obtaining such opinion, the questioner is permitted to assume as proven the basic facts he is attempting to establish, and which are usually vital issues in the case. The opinion, therefore, is a dependent—a sort of superstructure imposed upon an hypothetical foundation—and stands or falls with its supporting facts. Obviously, a conclusion cannot serve to strengthen the premises

from which it arises. Therefore, the statement that such evidence "does not even tend to prove any fact upon which it is based" is correct in principle.

It is the duty of the court when called upon, to define the nature of expert evidence in the instruction given the jury; and error cannot be held to result from a correct definition. The meaning of the language employed in the instruction before us is clear and free from ambiguity, and we must presume the jury understood it in its proper sense. If they did, no room appears for the supposition that the credibility of witnesses who testified both to facts and opinion may have been affected improperly by the rules peculiar to opinion evidence, nor that the jury failed to give due weight to the entire testimony of such witnesses. The principle embodied in the final sentence of the instruction has been approved in a number of cases, and may be considered a settled rule. As opinion evidence is but advisory, the jury is not bound by it. [Hull v. Trustee, 138 Mo. 618; Cosgrove v. Leonard, 134 Mo. 425; Kansas City v. Street, 36 Mo. App. 666; Tel. Co. v. Guernsey, 46 Mo. App. 120.]

The judgment is affirmed. All concur.