SUSIE S. ROSE, Respondent, v. FRANKLIN LIFE
    INSURANCE COMPANY, Appellant.

St. Louis Court of Appeals, November 29, 1910.

1. **APPELLATE PRACTICE: Review: Sufficiency of Exceptions.**
   In a trial to the court, the failure of defendant to except to
   special findings of fact made by the trial court will not prevent
   the appellate court from reviewing the action of the trial court
   in overruling a demurrer to the evidence, which action was
   excepted to.

2. **LIFE INSURANCE: Forfeiture for Non-Payment of Premiums:
   Statutes: Construction of Technical Terms.**   In construing sec-

Rose v. Life Insurance Co.

tion 7897, Revised Statutes 1899, which provides that policies of insurance on life shall not be forfeited by reason of nonpayment of premiums where three-fourths of the net value of the policy is sufficient to secure temporary insurance, etc., "net value" is a technical term, and is to be taken in its technical sense.

3. **STATUTES: Construction of Technical Terms: Question for Court.** In construing a statute, the meaning of technical terms is a question for the court, and it may determine their meaning by consulting books of reference, or by referring to persons who have knowledge on the subject. -

4. ———: ———: **Settled Meaning.** In construing a statute containing technical terms, it is important to ascertain whether the words had a settled technical meaning before the statute was enacted, as, in that case, it will be assumed the Legislature used them in that sense.

5. ———: **Construction of Remedial Statute: Evils to Be Corrected.** In construing a remedial statute, the mischievous practice or evil intended to be terminated or cured by its enactment may be considered.

6. **LIFE INSURANCE: Net Value.** "Net value" or "reserve," in life insurance, existed long before either by contract or statute any part of it was devoted to extended insurance.

7. ———: **Premiums: Cost of Insurance Defined.** The cost of insurance for a single year of insured's life is the sum which the company must actually receive from the insured and augment with interest in order to meet the probability of insured's dying during that year, according to the mortality table, and such cost is greater with increasing age, because the probability of death grows greater. ·

8. ———: **"Net Value:" Defined.** The "net value" of a life insurance policy is the accumulation of the balance of past net premiums not absorbed in carrying the risk.

9. ———: ———: **Statute.** The "net value" of a policy of life insurance, under section 7897, Revised Statutes 1899, represents nothing but premiums actually collected from the policyholder in excess of the tabular costs up to the time of default, with interest added at the rate of four per cent per annum compounded. ·

10. ———: **Gross and Net Premiums Defined.** The "net premium" of a life insurance policy is the amount required to be paid by insured to meet the tabular cost and is figured to be the exact amount required to carry the insurance from period to period. "Gross premium" is the amount actually charged by the insurer under the contract, and usually exceeds the net

Rose v. Life Insurance Co.

premium by the addition of a certain "loading" for the profit and expenses of the company.

11. ——: Net Value: Gross Premiums to Be Applied. All money received by an insurance company as gross premiums on a life insurance policy must be applied toward the payment of the net level premium—that is, the tabular cost of insurance and the creation of the reserve which the form or class of the policy makes proper—before any part may be appropriated by the company for profit or expense.

12. ——: ——: Method of Computing: Statute. In computing the net value of a life insurance policy, under section 7897, Revised Statutes 1899, the policy must not, contrary to its terms, be treated as an "ordinary whole life policy" in which the premiums are level and fixed and payable at set intervals throughout the continuance of the risk.

13. ——: ——: ——: ——: Evidence: Based on False Premises. In an action on a life insurance policy, under section 7898, Revised Statutes 1899, providing for non-forfeiture because of lapse, etc., the evidence of an actuary as to the net value of a policy, based upon computations founded on an erroneous construction of the statute's requirements as to the elements of the computation, was wholly worthless.

14. ——: ——: Method of Computing. The net value of a life insurance policy is not greater in proportion to the smallness of the premium because the insured receives a greater benefit for his money, and the same reasoning applies to the departmental practice and the statutes intended to secure the solvency of insurance companies, such as section 6925, Revised Statutes 1909, which charges them as a liability with a reserve sufficient to meet all policy obligations and declares that if a policy does not provide for the payment of a sufficient net level premium to create a proper reserve, according to the form of the policy, the company shall supply the sufficiency out of its available assets.

15. ——: Action on Policy: Forfeiture for Non-Payment of Premiums: Net Value Held Insufficient to Carry Policy. In an action on a life insurance policy, prosecuted on the theory that, notwithstanding insured had defaulted in the payment of premiums, three-fourths of the net value of the policy at the time of the lapse was sufficient, when used as a single net premium, as contemplated by section 7897, Revised Statutes 1899, to provide temporary insurance to the time of insured's death; *held*, the evidence did not establish that the policy had such value.

Appeal from Lincoln Circuit Court.—*Hon. James D. Barnett*, Judge.

REVERSED.

*Jones, Jones, Hocker & Davis* and *O. H. Avery* for appellant.

The judgment on both counts should have been for the defendant. Mutual Reserve v. Roth, 122 Fed. 853; Westerman v. K. P., 196 Mo. 711; Gessner v. Railway Co., 137 Mo. App. 47; Statham v. Insurance Co., 93 U. S. 34; Relfe v. Insurance Co., 76 Mo. 603; Rumbold v. Insurance Co., 7 Mo. App. 73; State v. Vandiver, 213 Mo. 187; Conn. Ins. Co. v. Commonwealth, 133 Mass. 164.

*Wm. A. Dudley* for respondent.

(1) The policy is a Missouri contract and the non-forfeiture law—R. S. 1899, secs. 7897-7899—is part of the contract. Cravens v. Ins. Co., 148 Mo. 599; Whittaker v. Ins. Co., 133 Mo. App. 664; Price v. Ins. Co., 48 Mo. App. 281; 2 May of Ins., sec. 344 b. (2) No exceptions to the findings of fact were made, filed or overruled, and therefore none to an order overruling exceptions to the findings. They fully sustain the judgment and are conclusive. Bank v. Barbee, 198 Mo. 469; Leavitt v. Taylor, 163 Mo. 170; Grain Co. v. Beeker, 76 Mo. App. 379; Ins. Co. v. Tribble, 86 Mo. App. 546; Gilmore v. Harp, 92 Mo. App. 77; Steele v. Johnson, 96 Mo. App. 147, 156; Rauch v. Michel, 192 Mo. 293; Burgess v. Ins. Co., 114 Mo. App. 169. (3) The policy was properly construed as a whole life policy on its face and under the evidence as to what is meant by "term" and "whole life" policies. 1 May on Ins. (3 Ed.), sec. 179c, p. 366; S. W. Cotton Press Co. v. Hall, 26 Mo. 386; Walsh v. Transportation Co., 52 Mo. 434; Baer v. Glaser, 90 Mo. App. 289; Realty Co. v. Moynihan, 179 Mo. 642; 12 Cyc., p. 1082, par. c; 9 id., p. 578, par. 3.

STATEMENT.—This is an action on a policy of life insurance for two thousand dollars issued to Thomas

M. Rose on the 2d day of July, 1900. The plaintiff is his widow and the beneficiary in the policy.

The said policy contained provisions in substance as follows:

"The Franklin Life Insurance Company hereby promises to pay $2000 on the receipt of satisfactory proofs of death of Thomas M. Rose, provided this policy is then in force, to Susie S. Rose, if living.

This insurance is granted in consideration . . . of the payment in advance of $36.54 and of the payment of a like amount on or before the second day of July in every year following until premiums for the term of five years have been duly paid; and of the further payment of the life rate premium of $70.80, on or before the date above mentioned in every year thereafter during the continuance of this policy.

In case of default of any premium after one full year's life rate premium has been paid in cash, the company will:

(a) Without action of the insured continue the full amount of insurance during the time specified in the following table. . . .

(b) Upon due surrender of this policy within sixty days after such default, issue a non-participating paid-up life policy, as specified in said table; and after this policy has been in force one year under life-rate, the company will loan the value stated in the following table.

(And the policy contained the table of loan, temporary or continued insurance and paid-up insurance values referred to in the foregoing provisions.)

Failure to pay any renewal premium of this contract will render it null and void.

A grace of one month will be allowed in the payment of permiums."

At the date of said policy, Thomas M. Rose was forty-three years of age and his age was so stated in the

policy. He paid to the defendant the five annual premiums of $36.54 falling due on the second day of July of the years 1900 and 1904, inclusive and no more. He made default of premium, and the policy by its terms lapsed on July 2, 1905. After such default and lapse he lived two years, ten months and six days, dying May 8, 1908. Proof of death was waived.

The trial was to the court. No declarations of law were asked or given. There was a written finding of facts made pursuant to request under the statute. On the same day, judgment was rendered for plaintiff for $1818.68 being the amount of the policy, $2000 with six per cent interest from date of suit, less three unpaid annual premiums of $70.80 each with 6 per cent interest compounded annually from the dates when they respectively became due.

After unsuccessful motions for new trial and in arrest, the defendant appealed.

Other facts deemed necessary to be understood will appear in the opinion proper.

CAULFIELD, J. (after stating the facts).—The suit was brought and prosecuted by plaintiff upon the theory that the policy, notwithstanding the lapse, had, at the time of lapse, a net value, three-fourths of which was sufficient when used as a net single premium (as contemplated by sec. 7897, R. S. 1899) to provide temporary insurance for the time that intervened between lapse and death, and the question which we deem decisive of this appeal is whether the policy had such net value.

The defendant raised the question by demurring to the evidence at the close of the plaintiff's case and again at the close of all the evidence, and this was overruled, defendant duly excepting to such action of the court.

Defendant also attempted to raise this question by suggesting for the first time in its motion for a new trial that the court erred in certain of its findings of facts.

Plaintiff disposes of this suggestion by pointing out that defendant did not except to said findings and therefore cannot complain of them as such. However this may be, we can find no authority, and plaintiff cites us to none, holding that a failure to except to special findings of fact closes the door of investigation as to whether the trial court erred in its rulings during the trial. The failure to except to the findings will not prevent us reviewing the action of the trial court in overruling the demurrer to the evidence, which action was excepted to.

We are satisfied upon reading the record that there is really no controversy as to the facts. The case upon said demurrer turns upon the meaning of the term "net value" as used in the statute, section 7897, Revised Statute 1899, which is admittedly applicable, and which, omitting parts not important to this controversy, is in substance as follows:

"Policies non-forfeitable, when.— No policies of insurance on life . . . shall, after payment upon it of three annual payments, be forfeited or become void, by reason of non-payment of premiums thereof, but it shall be subject to the following rules of commutation.

The net value of the policy, when the premium becomes due, and is not paid, shall be computed upon the actuaries' or combined experience table of mortality, with four per cent interest per annum, and . . . three-fourths of such net value . . . shall be taken as a net single premium for temporary insurance for the full amount written in the policy; and the term for which said temporary insurance shall be in force shall be determined by the age of the person whose life is insured at the time of default of premium, and the assumption of mortality and interest aforesaid."

The words "net value" being technical words are to be taken in their technical sense. [Sutherland, Statutory Construction, sec. 393; sec. 8057, R. S. 1909.]

Their meaning is for the court, who may ascertain their meaning by referring to persons who have knowl-

Rose v. Life Insurance Co.

edge on the subject or by consulting books or reference containing information thereon. [Sutherland, Statutory Construction, sec. 391.]

It is important to ascertain whether the words had a settled technical meaning before the statute was enacted as in that case we must assume that the Legislature used them in that sense. [Ruckmaboye v. Mottichund, 8 Moore (P. C.) p. 20.]

It will also aid and should greatly influence us to a correct interpretation of the statute and the sense in which it uses the words "net value", to ascertain the mischievous practice or evil intended to be terminated or cured by its enactment. [Westerman v. Supreme Lodge Knights of Pythias, 196 Mo. 670, 711, 94 S. W. 470.]

What is known in the language of life insurance as "net value" or "reserve" as it is sometimes called, existed long before either by contract or by statute any part of it was devoted to extended insurance. [State v. Vandiver, 213 Mo. 187, 111 S. W. 911.]

It seems that the cost of insurance for a single year of the insured's life is the sum which the company must actually receive from the insured and augment with interest in order to meet the probability of the insured dying during that year, according to the mortality table. Such cost is greater with increasing age, because the probability of death grows greater. Thus if a man is insured at age 99 the cost of $1000 insurance, ignoring interest, would be $1000, because the table assumes that the insured will die during that year. At age 98 the cost is $750, because the probability of death in that year is less. At age 43 the cost is only $11.25.

And it has been said that "the simplest form of carrying on the business of life insurance would be for the company to charge the policy-holder each year with the sum which it costs to insure him for that year." [Connecticut Ins. Co. v. Commonwealth, 133 Mass. l. c. 164.] The insurer and the insured would be concerned

153 App—7

only with the cost to be paid during and for the year based upon the probability of the insured dying that year. If at the end of the year the insured abandoned the contract, he would have had his insurance and the insurer would have been paid for having carried the risk. The cost of carrying the risk would have exactly equalled the money paid to cover it. The account between the insurer and the insured would stand balanced.

But the insurance companies did not follow that simple plan. It became the general practice to ascertain in advance what these increasing yearly costs would average each year throughout an average life, and to charge each year such average sum. Necessarily, under this practice, during the earlier years the insured paid more than it cost to insure him for those years. Such payments in excess made in earlier years were really payments in advance by the insured to accumulate a fund applicable to the larger cost of his insurance in later years. The same result might have been obtained if he had deposited the excess in a savings bank. Hence the insurer has been, properly, we think, likened to a savings bank for the insured in respect of this fund. [New York Life Ins. Co. v. Statham et al., 93 U. S. 24, 35; Connecticut Ins. Co. v. Commonwealth, 133 Mass. 161, 165.]

Augmented by interest the fund thus created swelled the net premiums receivable of the future to their proper size and made them sufficient to meet increased cost of their time. The statute under discussion is said to have been borrowed from Massachusetts. [Westerman v. Supreme Lodge Knights of Pythias, 196 Mo. 670, 711, 94 S. W. 470.] The Supreme Court of that state has said: "It is this feature of the business (the excess payment accumulation) which gives existence to "net values" within the meaning of our statutes; the net value of a policy being represented by a sum which, with compound interest at the rate of four per cent per

Rose v. Life Insurance Co.

annum, and with the addition of future net premiums, will provide for the payment of the policy when it matures, according to the 'combined experience' or actuaries' table of mortality." [Connecticut Ins. Co. v. Commonwealth, 133 Mass. 161.]

Now if nothing had occurred to mar the relations of insurer and insured and the policy had continued to its maturity, the insured paying premiums and the insurer carrying the risk, this "net value" or "reserve" would have been used as originally contemplated, that is, toward making sufficient the insufficient payments of later years. Or if all insurers had returned the fund called "net value" to its owner, the insured, when the insurance contract ceased on account of lapse, or if, as some insurers did voluntarily, all insurers had applied the fund toward purchasing extended insurance for the benefit of the insured, then no injustice would have resulted, and no non-forfeiture law would have been needed. But the insurance companies did not all follow this benevolent and just practice. On the contrary, the appropriation of these funds, by insurance companies, became a source of considerable profit to them. The savings of the insured were frequently confiscated.. It was to remedy this unfair practice that the non-forfeiture law was enacted. [Mutual Reserve Life Ins. Co. v. Roth, 122 Fed. Rep. 853, 857.] The insurance companies were to be prevented from taking all the money that had been paid in excess by the policy holder without giving value for it. They were to be compelled to give him temporary insurance for such a period beyond the lapse as three-fourths of the fund created by his excess of payments was sufficient to pay for. The purpose was to prevent the insurance company taking something it was not entitled to.

There is nothing in the definitions given by the actuarial witnesses in this case conflicting in the slightest degree with the foregoing.

Mitchell, plaintiff's only actuarial witness, said that "net value" "as known in actuarial science, may be variously defined." He then gives one of the definitions as follows: " 'Net value' is the difference between the net single premium at the attained age (the age at which lapse occurred) and the present value at that age of future premiums receivable."

An analysis of this definition shows that it comprehends the same accumulation of excess premium payments we have discussed. "Net single premium" is really only the aggregate of the future yearly costs of the insurance, severally discounted to the age from which the computation is made. If the net future premiums are less than said aggregate of costs, there will be a deficiency or difference to be made up. Actuarial science assumes that they will not be less and there will be no difference unless the averaging system is resorted to; that is, unless the future premiums are made less to average with the earlier premiums which were made more. The difference is necessarily equal to the fund accumulated from earlier excess of payments. All of which is no more than saying that "net value" is "the accumulation of the balance of past net premiums not absorbed in carrying the risk" which last definition is apparently recognized by the actuaries as being equally correct with the one given by Mitchell, to which they all agree. Both definitions mean the same thing, and followed as formulae produce exactly the same result.

Plaintiff's actuary, Mitchell, corroborates our impression by conceding that if this policy is to be regarded as "term" insurance for the first five years, (in which case it is assumed that there would be no accumulation from past payments at the end of the five year term), with a provision for renewal as a whole life policy for the remainder, there would be no difference between the net single premium and the future net premiums, and hence no net value to the policy.

We consider it well settled that the net value of a

policy under sec. 7897, represents nothing but premiums actually collected from the policy holder in excess of the tabular costs up to the time of default, with four per cent per annum compound interest added. [Connecticut Ins. Co. v. Commonwealth, supra; Mutual Reserve Life Ins. Co. v. Roth, supra; State v. Vandiver, supra.]

Before inquiring what was collected upon this policy, we will distinguish between "net premiums" and "gross premiums". According to plaintiff's actuary, net premium is the amount required to be paid by the insured to meet the tabular cost and is figured to be the exact amount required to carry the insurance from period to period. Gross premium is the amount actually charged by the insurer under the contract, and usually exceeds the net premium by the addition of a certain "loading" for the profit and expenses of the company, such as agents commissions, rent, taxes, etc.

Actuarily, the net premium only should be considered in computing net value. But it has been held, and we think rightly, that all the money received by the insurance company as gross premiums under a policy must be applied toward the payment of the net level premium, that is, toward the payment of the tabular costs and the creation of the reserve which the form or class of the policy makes proper, before any part can be appropriated by the insurance company for profit or expense. [Moore v. Insurance Co., 112 Mo. App. 696, 87 S. W. 988.]

It is manifest, however, that if in the case at bar the entire amount received by the insurance company as gross premiums on account of the policy in suit is thus applied and still the reserve or net value created is insufficient to carry the policy from the lapse to the death of the insured, then the plaintiff cannot recover.

Now, Mitchell the actuary, who was plaintiff's only witness as to value, testified that the tabular costs of the $2000 insurance in suit for the five years for which pre-

miums were paid aggregated $118.32. The gross premiums for that period, paid upon the policy, aggregated only $182.70. This would leave only $64.38 excess of gross premium over the tabular cost. This excess or surplus roughly augmented by four per cent interest compounded, that is to say, the "net value" of the policy, would have amounted to less than $73 at the time of the lapse. Three-fourths of this would have amounted to $54.75, all that could have been applied under the statute to the purchase of temporary insurance, even if gross premiums were treated as net premiums. The court found that the smallest amount necessary as a single premium to purchase temporary insurance of $2000 from the time of the lapse to the time when Rose died was $75.90, to meet which there was only $54.75 available under the statute. It is apparent therefore that three-fourths of the net value of this policy at the time of the lapse was insufficient to keep it alive after the lapse until the death of the insured.

But the plaintiff's witness, Mitchell, testified that "the net value of this policy, five premiums having been paid and lapse occurring, is $173.56," a sum, we may say, three-fourths of which was more than sufficient to keep the policy alive beyond the time when Rose died. He frankly and voluntarily stated, however, that his answer was based upon the assumption that the Missouri non-forfeiture law, for the purpose of valuing the policy, creates a fixed artificial standard independent of the kind of policy or rate of premium.

On cross-examination, he explained that he assumed that the statute required that the net value be figured upon all policies as though they were "ordinary whole life policies", i. e. policies in which the risk is coincident with life and the premiums are level and fixed and payable at set intervals throughout the continuance of the risk. He conceded that while the policy in suit does not provide for level premiums during the whole of life and therefore was not in fact an "ordinary whole

life policy", he had arrived at the net value given by him only by treating it as an "ordinary whole life policy" and only by assuming, contrary to the fact, that it had level net annual premiums from the date of the policy. He admitted that this method was not the method of figuring net value according to actuarial science, but that he felt compelled to resort to it by his construction of the Missouri non-forfeiture law; that were it not that he so construed the law, he would not answer that the policy had the value he had indicated.

The United States Circuit Court of Appeals, Eighth Circuit, in an ably considered opinion by Judge THAYER, held that the statute would not fairly bear a construction so entirely foreign to its true purpose. [Mutual Reserve Life Ins. Co. v. Roth, 122 Fed. Rep. 853.] We approve of that conclusion.

It follows that the expert testimony of witness Mitchell as to the net value of the policy, being confessedly based upon a false assumption of fact induced by an erroneous construction of the law, is utterly worthless. [Smith v. Telephone, 113 Mo. App. 1. c. 443, 87 S. W. 71.]

But plaintiff's counsel has evolved another theory which we will dispose of. Roughly stated it is that inasmuch as a policy of insurance is an executory contract, and the value of the company's promise is fixed, except in so far as it is reduced by the present value of the premiums to be paid upon it by the insured, then the smaller the premiums the greater the value of the policy. In this way he would treat the policy as one would a leasehold estate, where the smaller the rent, the more valuable is the estate.

It is true that a policy issued by a company solvent enough to do business at a loss would be more valuable, in a sense, to the insured, as his burden is made lighter. But it would not have a greater net value within the meaning of our statute, under which, it seems to us, the

tendency is for the premiums and "net value" to diminish together. In return for smaller premiums the insured must increase his vigilance against lapse. The non-forfeiture law did not have in mind rewarding genius in bargain driving. It exhausts itself when it fulfills its fair and equitable purpose of giving the insured all of the insurance his excess of past payments are sufficient to pay for.

Plaintiff's counsel also points to the testimony of one of defendant's witnesses that under ordinary valuation practice, if the gross premium throughout the life of the policy is less than the net premium, then to the regular reserve, computed on the assumption that the gross premium was at least equal to the net premium, must be added something to make up the deficiency. This means nothing more than that under such circumstances the insurer out of its own pocket must make up the deficiency in order to meet its obligation at maturity. To hold that the insured must have a benefit in extended insurance on account of the company's loss in that case would violate the purpose of our statute.

And the same reasoning applies to the departmental practice and statutes intended to secure the solvency of insurance companies, such as section 6925, Revised Statute 1909. It is entirely proper and necessary that, in valuing the policies with a view to ascertaining the insurance company's solvency or its right to do business in this state, the company shall be charged as a liability with the reserve proper to anticipate and meet its policy obligations, and if a policy does not contain provisions for the payment of a sufficient net level premium to create a proper reserve, according to the form of the policy, the company must supply the deficiency out of its available assets, and if they are insufficient for that purpose the company is insolvent and should not be permitted to continue in business. And the company must meet its contract obligation to the policy holder,

although the consideration it exacted for assuming such obligation was insufficient. This is true without regard to our non-forfeiture laws. But it does not follow that section 7897, designed to prevent insurance companies appropriating to their own uses money in equity belonging to the policy-holder, should be so construed as to give the policy-holder extended insurance which was not paid for.

As there was absolutely no evidence in the case tending to show a sufficient net value to keep the policy in suit alive to the time of the insured's death, defendant's demurrer to the evidence at the close of all the evidence should have been sustained. We are also convinced that upon the undisputed facts plaintiff cannot recover upon the policy in suit.

In reaching the above conclusions, we have not taken the pains to determine whether the policy is a "term policy" for the first five years with a privilege of renewal as an "ordinary whole life policy" thereafter, which theory is so earnestly and ably striven for by the appellant's counsel. We have refrained from doing so because we consider it unnecessary in this particular case. We do not wish to be understood as expressing any opinion upon that subject.

The judgment will be reversed. *Reynolds, P. J.*, and *Nortoni, J.*, concur.