[No. 25652. *En Banc.* October 28, 1935.]

EVELYN MURGATROYD, *Respondent,* v. HOMER D. DUDLEY *et al., Appellants.*[1]

[1]Reported in 50 P. (2d) 1025.

*J. Speed Smith, Henry Elliott, Jr.,* and *Roberts & Skeel,* for appellants.

*Wright & Wright* and *Shank, Belt, Rode & Cook,* for respondent.

HOLCOMB, J.—This suit is one for malpractice against Dr. Homer D. Dudley and his wife. Dr. Dudley, being the principal actor in the matter, for brevity, will be mentioned in the singular number.

Respondent recovered a verdict for fifteen thousand dollars. On hearing the motion of appellant for a new trial, the trial court reduced the verdict to ten thousand dollars, or, in the alternative, granted a new trial in case the reduction was not accepted by respondent. Respondent remitted five thousand dollars, upon which judgment was entered against appellant for ten thousand dollars.

These facts are not in dispute:

Respondent was a nurse fifty-six years of age with a life expectancy of 16.72 years. Her earning capacity was one hundred dollars per month.

On November 5, 1930, while nursing a child afflicted with a streptococcus infection of the throat, respondent pricked the thumb on her right hand deeply with a safety pin. Only a drop or two of blood flowed from the wound. She knew that it was a dangerous thing to have such a wound and promptly washed it with hot water and dressed it with iodine and alcohol. The next day, November 6, she felt chilly and had no appetite. On November 7, she spoke to the doctor who had charge of the child's case, and he gave her some lotions and told her to keep the thumb in wet dressings. The thumb was then very sore and growing swollen and red.

She continued nursing the child until the next day, when her temperature was up; and as she could stand it no longer, she quit nursing the child, went to her home, and, following the instructions the doctor had given her, applied wet dressings and heat. That night (Saturday), the hand was more swollen, redder and sorer, and on Sunday, the 9th, it became worse. Her intimate friends, Miss Currie and Miss Casey, fellow-nurses who lived at the same hotel, attended her. Miss Casey said respondent was a very sick person and told her the infection was spreading. It seemed to be getting ahead of them, and she was quite alarmed.

Appellant was called into the case on Monday afternoon, November 10. He immediately took her to the Cobb Building Surgery, where she was admitted as a patient. Her hand was put into a hot saline solution to localize the infection, and from November 10 to November 13, hot moist compresses were applied. On November 13, she was taken into the operating room in the surgery, where incisions were made on both sides of the wrist just below the wrist on the forearm, while other incisions were made on the back of the hand. On November 18, still another incision was

made on the back of the hand, and there seemed to have been a gradual subsidence of swelling and temperature from that time until November 24; but on November 22 and 23 her hand was showing the effects of ankylosis, the fingers having only a little motion and the wrist showing stiffness all over, though she was practicing them in an endeavor to get movement of the fingers.

Some days prior to November 24, appellant had a representative of a manufacturer of orthopedic and fracture appliances call at the surgery and measure respondent's arm for a brace, or splint. On November 24, appellant applied what he called a "banjo splint," a reproduction of which he introduced in evidence at the trial. The purpose of the brace or splint was to put the hand in a position of functioning. A general anaesthetic was given respondent in applying the brace, or splint, on account of the pain involved in placing the hand in a position of functioning. Appellant visited the surgery the next day, the 25th, and she complained to him of considerable pain, of the uncomfortable position of her right hand and arm and the tight bandage, but he told her that the swelling and discoloration were due to the manipulation. It is also undisputed that appellant visited her on December 1 and, when he saw the situation, immediately ordered the cast removed.

These facts are in dispute:

The splint introduced by appellant at the trial was disputed by respondent and her witnesses as not being the kind of a splint in which her arm was placed. Respondent testified that, from November 25 until December 1, appellant never visited her, and during that time the hand and wrist became terribly swollen and discolored; that her temperature arose to a dangerous

point, with the pain so intense that the nurses were compelled to administer opiates to her.

Another controverted matter is, in what position appellant placed respondent's hand and arm when he applied what he called the "banjo splint." She and her witnesses testified that the hand was drawn back at an angle of about ninety degrees, or at right angles, with the wrist bound in that position too tightly. Appellant and the doctor who administered the anaesthetic said that it was placed in the splint at an angle of forty or forty-five degrees.

At this point, it is well to note that the two medical experts testifying for appellant, and appellant, testified that the angle of forty or forty-five degrees was the correct position for the hand to be placed in the splint, and that the angle of ninety degrees would not be a proper position to secure proper functioning of the hand. Her medical witness also said that the angle of forty-five degrees, as being the proper position, would depend upon the age of the patient and other conditions, and that there might be some special condition when the fingers should be kept straight and extended. The forty or forty-five degree angle for the hand to be placed in a splint for such a condition, all the doctors agreed, was the rule laid down by a Dr. Kanavel, who all of the experts agreed was authority upon that kind of surgery.

The medical expert for respondent also stated that he would have put the hand up in a position of functioning immediately, but not in a forcible application in a splint, "meaning that he would not have used any forcible means." He also said that he would agree that what appellant *claims to have done* constitutes good practice.

At the trial in September, 1934, respondent's fingers and wrist were still stiff. She had no movement in

either except a slight movement of the thumb toward the palm and some abduction of the fingers.

The amended complaint alleged that appellant was responsible for this condition and alleged negligence as follows: (1) That he failed to observe respondent's condition, diagnose the same, and immediately treat that condition; (2) that he did not allow sufficient time for proper drainage after the incisions had been made; (3) that he applied to the hand a splint holding the hand in an exaggerated retroflexed position; (4) that he applied a cast around the splint and around the forearm so tight that it interfered with the circulation and proper drainage; (5) that he failed to keep respondent under his observation thereafter; and (6) that he left her without any medical observation or care for a period of approximately four days after the application of the splint and cast.

During the trial, appellant offered in evidence the hospital record of the Cobb Building Surgery, which showed that this record was kept by the six nurses who attended respondent, including Miss Casey and Miss Currie, her intimate friends, who nursed her a portion of the time. All of the nurses, including Miss Casey and Miss Currie, were produced except a Miss Turner.

Miss Barton, one of the nurses, testified that she had charge of the surgery; that the entries were made by the different nurses as to what took place on each day; that she sometimes made the entries when she was there and had time; and that all of the entries were made on the day the occurrences took place. Another nurse, Miss Cooper, testified that she was the only nurse on duty from seven p. m. until seven a. m., that is, night duty, and had complete charge of the surgery and of the patients during those hours. She identified the chart as that made at the Cobb Building Surgery for the case of Mrs. Murgatroyd. She testified that

she recognized the handwriting of all of the nurses who had made entries and identified the fifth as that of Miss Turner.

Miss Cooper, who seems to have been better acquainted with Miss Turner than any other, testified that Miss Turner visited her in 1932, but since then she had heard nothing from her. Miss Cobley, another nurse, testified that she and Miss Turner worked at the Cobb Building Surgery together for about two years after respondent had been there; that she did not know where Miss Turner could now be found, as she had not seen her for three years and had no idea where she was at the time of the trial.

Respondent, apparently with some reluctance, conceded the admissibility of all of the record except the one entry made by Miss Turner, shown without dispute to have been in her handwriting, as of November 28, 1930. That entry, which was clipped from the record of that day, reads: "Dr. Dudley changed dressing. Moist dressing used."

Respondent's intimate friend, Miss Currie, who was in charge of her case a substantial part of three days, admitted that appellant visited respondent in her room at the surgery the day immediately following the application of the cast, and that she recorded his visit in the hospital record for that day in her own handwriting. She admitted that appellant may have been there the other days without her seeing him.

The hospital chart, which was admitted in evidence, shows that on 11/24/30, 7:40 a. m., "Dr. Dudley called;" on 11/25/30, 2 p. m., "Dr. Dudley visited. Dressing done;" 6:30 p. m., "Very good day;" and on 11/26/30 at 6:00 a. m., "Slept well from 2:00-5:30. Seems better this a. m.;" 2:00 p. m., "Dr. Dudley here, Dressing removed, Cast cut away from wrist, Light to hand for 30 Min." Miss Currie testified that this last

entry was made by Miss Cobley, a nurse who was with her in the surgery for several years, in the absence of herself when she was away for a few hours.

We find nothing in the record to justify the claim of appellant that respondent changed her theory of negligence on the part of appellant from one of not allowing sufficient time to allow proper drainage after the incisions to one of delaying too long to put the hand in the position of functioning after the incisions.

It is very plain that there were vital issues of fact upon which appellant and respondent were widely apart as to any negligence on the part of appellant. Respondent contended and introduced evidence to show that the splint in which appellant said he placed respondent's hand, and which he attempted to show was the one he used, was not the one he used and was not a proper one under the medical authorities and their own experts. It was also a much disputed question of fact as to whether appellant placed the hand at an angle of forty or forty-five degrees, or about ninety degrees, which last, all of the experts agreed, would not be proper to secure a satisfactory functioning of the hand.

It was also an element of negligence alleged by respondent and controverted by appellant as to whether he neglected respondent when she was in the surgery for the four to six days from and after November 25. True, respondent testified that he did not visit her during those four to six days, but the hospital record, in part, contradicts her. Appellant had the right to show by any competent evidence that he did not neglect her during any or all of those days after November 25. If any part of the hospital record was competent, that particular item was competent, small as it is, as tending to dispute her testimony. Respond-

ent does not contend that it would be unprejudicial, if relevant and competent.

We consider that it was sufficiently proven, as being a record kept in the ordinary course of the hospital business, to come within our rule as an exception to the "hearsay rule," stated in *Pioneer Sand & Gravel Co. v. International Contract Co.*, 70 Wash. 123, 126 Pac. 84:

"Respondent's employee, who superintended the original measurement and shipment of the sand and gravel and made the original notations for the books, was no longer in respondent's employ, had left the country, could not be found, and therefore could not be produced as a witness on the trial. His employment, duties, and handwriting were proven, and his absence accounted for."

All of the foregoing elements were shown in this case except that Miss Turner's absence was not accounted for, which was probably impossible, owing to the nature of her occupation and the acquaintances she had made in Seattle.

As to the admission of hospital records generally, see 3 Wigmore on Evidence (2d ed.), § 1707, 662-3; *Wright v. Upson*, 303 Ill. 120, 135 N. E. 209; *Lund v. Olson*, 182 Minn. 204, 234 N. W. 310, 75 A. L. R. 371; *Globe Indemnity Co. v. Reinhart*, 152 Md. 439, 137 Atl. 43; *Kimber v. Kimber*, 317 Ill. 561, 148 N. E. 293.

█ Another contention forcibly argued by appellant is in giving the following instruction:

"The court has allowed in this case, the introduction of evidence known as expert testimony, and has allowed expert witnesses to testify herein. You are instructed that you are not bound by the testimony of such witnesses, but that you are to consider such testimony in connection with all other facts in evidence, and that you are to give such testimony such weight and credit as you shall deem it entitled to, and in taking into consideration the knowledge, skill and intelligence

of such expert witnesses as disclosed in their testimony and by all the facts and circumstances shown and developed in their testimony. The value of opinion testimony is in all cases a question to be determined by the jury, and it is the duty of the jury to determine its verdict herein upon a consideration of all the evidence before them.''

Appellant contends that this instruction, although taken literally from our decision in *Wilcox v. Carroll,* 127 Wash. 1, 219 Pac. 34, is erroneous and prejudicial as violating the provisions of our state constitutional prohibition against judges commenting on the evidence. Art. IV, § 16. We find no merit in this contention. It is no more a comment on matters of fact than the ordinary instruction given by trial courts as to the credibility of all witnesses which has been uniformly approved by this court.

Nor is it singling out one witness and pointing him out to the jury as subject to peculiar caution, as was done in *Peizer v. Seattle,* 174 Wash. 95, 24 P. (2d) 444, and condemned by us. (Not cited.) Such an instruction does not allude to the expert witnesses on behalf of one side more than the other, and states a rule that has been approved by other courts. *Nordyke & Marmon Co. v. Whitehead,* 183 Ind. 7, 106 N. E. 867; *Morrow v. National Masonic Acc. Ass'n,* 125 Iowa 633, 101 N. W. 468; *Cosgrove v. Burton,* 104 Mo. App. 698, 78 S. W. 667; *Smith v. Missouri & Kansas Telephone Co.,* 113 Mo. App. 429, 87 S. W. 71; *Chicago, R. I. & P. R. Co. v. Penix,* 61 Okla. 4, 159 Pac. 1141.

Appellant also claims errors in giving and refusing several instructions. We have carefully read all of the instructions given and those refused. The court carefully pointed out in one instruction the limit of liability of a physician or surgeon in this state, as stated in *Wilcox v. Carroll, supra,* and other cases in this jurisdiction. It also instructed, following the law

particularly and carefully, as declared in *Griffis v. Brown*, 149 Wash. 203, 270 Pac. 819, and *Samuelson v. Taylor*, 160 Wash. 369, 295 Pac. 113.

Appellant particularly complains that the trial court, in an instruction given, No. 15, did not sufficiently separate the pain, disfigurement, humiliation and mental suffering endured by respondent from the infection itself as distinguished from any negligence of which appellant may have been guilty.

The giving of that instruction by the trial court is not assigned as one of the errors relied upon by appellant in his brief. The record shows it was excepted to only as to the second paragraph relating to the loss of earnings and impairment of the earning power of respondent in the future. Appellant apparently assumed upon the giving of that instruction that it was otherwise in accord with the law established in this state.

However, appellant did request an instruction reading:

"If under the evidence and these instructions you should find in favor of the plaintiff you can only allow her damages for so much of her disability as you believe from the evidence is due solely to the negligence of the defendant, and not for any disability that you may find was due to the infection itself."

A proper and sufficient exception was taken to the refusal to give that instruction.

Under the circumstances of this case, since the surgeon was not responsible or liable for the original injury, but liable only, if at all, for subsequent negligent treatment, those phases should have been carefully separated by instructions in order that the jury might not be allowed to award damages upon mere speculation and conjecture. *McCormick v. Jones*, 152 Wash. 508, 278 Pac. 181, 65 A. L. R. 1019.

All of the instructions have been examined. In gen-

eral, the trial court instructed the jury that any recovery in an action of this kind must be one resulting wholly from the alleged negligence of appellant; and if the jury believed from the evidence in the case that any disability respondent had suffered in her hand resulted solely from the infection from which she was suffering at the time she consulted appellant, their verdict should be for appellant. The jury was further instructed that, before respondent could recover, she was required to show, first, that appellant was negligent in the treatment of her infected hand; and second, that the disability she now suffers was proximately caused by such negligence and not by the infection from which she suffered at the time he began to treat her. "Proximately caused" was correctly defined in a later instruction.

We also consider that the court gave the proper measure of damages to the jury in his instruction and that he exercised a sound discretion in reducing the amount of the award to ten thousand dollars. We would not be justified in increasing it under Rem. Rev. Stat., § 399-1 [P. C. § 8225-1], nor, would we be now disposed to reduce it. In other words, from the record before us, we are well satisfied that no recovery of more than ten thousand dollars would be justified. However, that will be a question for a jury to decide on retrial.

The negligence of appellant in the matters heretofore discussed are so sharply at issue that we think the entire hospital record should be admitted, including the small portion detached, and, upon retrial, the above quoted requested instruction be given.

For those errors, the judgment is reversed and the cause remanded for a new trial.

BLAKE, BEALS, TOLMAN, STEINERT, MITCHELL, and MAIN, JJ., concur.