## MOORE v. TREMELLING.

### No. 7608.

Circuit Court of Appeals, Ninth Circuit.

Aug. 12, 1935.

Walter H. Anderson, Clyde Bowen, and Gus Carr Anderson, all of Pocatello, Idaho, for appellant.

Ben W. Davis, of Pocatello, Idaho, and Louis Kabell, Jr., of Evanston, Wyo., for appellee.

Before WILBUR, DENMAN, and MATHEWS, Circuit Judges.

WILBUR, Circuit Judge.

Plaintiff brought this action to recover damages for malpractice. He sought damages in the sum of $30,180 and was awarded judgment for $5,473.75. From this judgment the defendant takes this appeal.

Plaintiff broke his hip on the 28th day of May, 1931. After the injury he was taken 23 miles in an automobile over dirt and gravel roads to the office of the defendant at Paris, Idaho, who for a consideration agreed to treat the injury. Appellant testified that he informed the plaintiff that the case should be treated in a hospital, and that, if treated in his home 23 miles from appellant's office, the patient should have a trained nurse to care for him, but that the patient refused to go to a hospital or employ a trained nurse on account of the expense, and decided to return to his home to be cared for there by his wife under appellant's direction. This testimony is contradicted by the patient, and we must therefore assume, in accordance with the verdict, that the appellant assumed the ordinary duties of a physician without a special contract limiting his duties or liabilities. Appellant took an X-ray picture of the patient's hip, and, after examining same, diagnosed the difficulty as an impacted complete fracture of the surgical neck of the right femur. The patient was placed in bed in a hotel across the street from the doctor's office. The limb was placed in splints and supported by sandbags awaiting the subsidence of the swelling. After the swelling had disappeared, the appellant applied a plaster cast to immobilize the leg in the proper position. It is conceded, or at any rate the testimony establishes, that, if this diagnosis was correct, the initial treatment by the appellant was the correct treatment for an impacted fracture in a man of the patient's age—59 years. It is also conceded that this treatment was not correct if the fracture was not impacted; that is, if the broken ends of the bone were not in contact. If the frac-

ture was not impacted, it was necessary to reduce the dislocation. To do this, it was necessary that traction be applied to the limb during the period it was in splints and when and after the cast was applied.

Five expert witnesses testified for the defendant that in their opinion the fracture was impacted, and four more experts tendered by him to support this contention were not permitted to testify because of the objection of plaintiff that the testimony was cumulative. All the experts agreed that the X-ray taken by the appellant showed an impacted fracture except Dr. Rich, called by plaintiff, who testified that he was unable to say from the X-ray picture whether or not it showed an impacted fracture. The importance of this question as to whether or not the fracture needed reduction arises because an X-ray picture of the fractured bone taken on September 27, 1933, by Dr. J. H. Holland, showed that the femur had slipped past the head about two inches and that the fibrous union connecting the head and the femur occurred at this point of contact. It is upon this imperfect result that the plaintiff bases his claim for damages.

The claim of the plaintiff was sustained in large measure by the testimony of Dr. Rich of Paris, Idaho, a young physician about 34 years of age, who testified he had never had a case of fractured femur, and whose opinion as to the proper procedure in case of a fractured femur was based largely upon text-book information and some observation of cases during the time he was an interne. He testified that, although he had the ability to read and interpret X-ray pictures that was common to the general practitioner, he had no special training or ability along that line. He testified that in his opinion the fracture was unimpacted. He based his diagnosis in part upon the X-ray picture and in part upon the degree of pain suffered and also upon the fact that the plaintiff had been unable to stand or to bear any weight upon his limb after it was broken and before plaintiff was treated by the appellant. He testified that in his opinion, if the fracture were impacted, he should have been able to stand. The other expert witnesses, without exception, testified that in case of such a fracture, whether impacted or unimpacted, the injured man would not be able to stand. Dr. Rich testified that in his opinion "the slipping up of the lower fragment would

be before there was any union. * * * the lower fragment was moved upward be-' fore there was a union. * * * The effect of putting weight on the limb before there was a union, or a solid union, would have a tendency of added traction or weight upon the leg and thigh. * * * Standing on the leg before there was a good bony union it would push the fragment upward." When called in rebuttal, he testified:

"In the healing of a fracture, especially in the neck of the femur, it is very slow and walking too soon would push the lower part of the fragment upward and the upper part of the lower fragment, being the trochanter—Q. Doctor, would that result in the condition shown by plaintiff's Exhibit Number One? [X-ray taken September 27, 1933, by Dr. Holland.] A. Yes, sir."

■ The other expert witness who testified for the plaintiff was Dr. Holland, who was consulted by the appellant in September, 1933, and took the X-ray picture of plaintiff's hip above mentioned. He attributed the defective union of the bone to the fact that the fracture was not properly reduced. He testified: "The fracture wasn't reduced, and it's just grown onto the bone below the spot where it ought to be." Later in his deposition, however, he testified as follows: "Q. It could have been reduced and then slipped out again? A. And slipped out again. I know nothing about the case except from this picture." Thus, while Dr. Rich testified in effect that the defective union was partly due to the failure to reduce the fracture by traction and partly due to the premature use of the leg by the patient, Dr. Holland testified that the defective result may have been caused from either a failure to reduce the fracture or a slipping of the fragments after a proper reduction without stating whether or not the slipping was or may have been caused by premature use of the leg. We thus have plaintiff's witnesses assigning either or both of two causes for the defective union of the bone. If it could be said that the failure to reduce the fracture and the advice to the patient to use the leg prematurely were both negligent, it might not be necessary for the plaintiff to distinguish between the damages resulting from the two separate acts of negligence, but, where one act is negligent and the other is not, the burden is upon the plaintiff to prove the damages which flow from the wrongful act. Moreover, as we shall presently see, it is not sufficient to prove negligence, but also it must be shown that a better result would have been obtained from proper treatment. Perkins v. Trueblood, 180 Cal. 437, 181 P. 642. In other words, the burden is upon the plaintiff to establish that the appellant's negligence was the proximate cause of the injury. This is the general rule in negligence cases. Decennial Digests, Negligence, Proximate cause of injury, ☞56 (1). The record is wholly barren of any evidence that proper treatment would have had a better result.

■ We will first consider the question of negligence in the initial treatment of the patient. This depends upon whether or not appellant was negligent in making the diagnosis of an impacted fracture rather than an unimpacted fracture. In determining the question, it should be borne in mind that, if a physician has the knowledge and professional skill equal to the average in the locality where he is practicing and exercises that knowledge without negligence, he is not liable for a mistake or error in judgment. Wilson v. Borden, 61 App. D. C. 327, 62 F.(2d) 866; Decennial Digests, Physicians and Surgeons, ☞14 (4). Appellant's liability in the case at bar, if any, arises from neglecting the sources of information open to a practitioner of average intelligence and ability in the locality where he practiced. It is conceded that the taking of an X-ray picture in order to assist in the diagnosis was usual and proper. This was done, and the X-ray was introduced in evidence. The only suggestion of negligence in this connection is that another picture should have been taken before the leg was placed in a plaster cast or immediately afterwards in order to ascertain whether or not the bones were in proper place. Dr. Rich testified he would have taken these X-ray pictures. There is no doubt they would have been informative. Appellant testified that he did not take a second X-ray because his measurement showed the bones were in position at the time he placed the patient in the cast and that he made such additional examination and manipulation at that time as was necessary to ascertain that fact. This is disputed, and this dispute raises some difficulty. The appellant testified positively as to what he did,

and the lay witnesses testified as to what they observed that he did or failed to do. Whether he used a tape to measure the legs as he said he did or merely determined from the position of the feet that there had been no displacement since the X-ray was taken is immaterial, if in the exercise of his honest and best judgment he concluded from such observation as he made that the fracture was impacted, unless such determination was negligent.

■■ In view of the opinion of the large number of professional witnesses to the effect that this was unquestionably an impacted fracture and was so shown by the X-ray pictures taken at the time, and in view of the fact that the opposing testimony of Dr. Rich merely goes to the expression of his opinion that the fracture was unimpacted and does not purport to show that there was negligence in diagnosing the fracture as an impacted one even if we assume, as the jury may have believed and found, that the fracture was not reduced, it would still be true that we have nothing more in the case than an error of judgment and no proof that the appellant did not exercise such professional skill and care as were reasonably to be expected in that locality. There is no testimony that physicians in that locality were in the habit of taking more than one X-ray picture in the case of such a fracture or of making any examination other than that such as was made by the appellant. All the expert evidence is to the contrary. The plaintiff so far has failed to show such an error of judgment in diagnosis as would justify a recovery. The treatment accorded the patient before the limb was placed in a plaster cast was in accordance with the diagnosis and conceded to be the correct treatment for an impacted fracture. If, for convenience, we divide the appellant's services into two stages, the initial treatment and the after treatment, and hold the former free from negligence and assume the latter negligent, then the evidence furnishes no basis for determining what result, if any, flowed from the latter and what from the former cause. The burden of proof is upon the plaintiff not only to show negligence but also the damage resulting therefrom. Judge Taft, when Circuit Judge, in Ewing v. Goode (C. C.) 78 F. 442, 444, stated that "when a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither." This statement was cited with approval by the Supreme Court in Gunning v. Cooley, 281 U. S. 90, 50 S. Ct. 231, 74 L. Ed. 720. See, also, Wilson v. Borden, 61 App. D. C. 327, 62 F.(2d) 866, supra. The rule is equally applicable to the situation in the case at bar where we have results which may have flowed from either of two causes, for if, as we have held, there was no negligence in the treatment of the fracture up to the time the cast was applied and we assume, as the appellee contends, that there was negligence in advising the premature use of the fractured leg, we would be confronted by two theories arising from the evidence of the plaintiff, one that the bad union of the bone was not the result of negligence and one that it was. We conclude that plaintiff cannot recover, having failed to establish that there was negligence in the initial treatment of the fractured bone and having failed to establish that the faulty union complained of was the result of any other act of negligence.

■ The next and most serious charge of negligence against appellant is that he ordered the patient in January, 1932, to use his leg freely and put weight on it. It is contended by the appellee that these instructions were erroneous and that as a result he placed more weight on the limb than he should and that this negligent advice and action thereon contributed to the bad result.

. With reference to this premature use of the leg by the plaintiff and the claim that this use was the result of the advice of the appellant, it should be stated that the evidence as to what was actually done and said is highly conflicting. The evidence of the experts as to the result of the premature use of the limb is also conflicting. Dr. Rich, as already stated, concluded that the bad result in the case of the plaintiff was partly or wholly due to the premature use of the leg. The appellant and some of his experts testified that in their opinion the bad result was due to conditions arising after the treatment by the appellant had ceased and was due to the physical condition of the plaintiff and the nature of his injury. This disagreement among the experts merely presents a conflict of testimony to be resolved by the jury.

It still remains to consider whether or not such advice, if given and if erroneous, was merely an error in judgment in the exercise of his profession for which without negligence there would be no recovery or whether the advice was negligently given. This in turn depends upon the skill used and to be expected in the practitioner of average skill in the locality. The only negligence ascribed to the appellant by Dr. Rich in this connection is the failure to have an X-ray picture taken before advising the use of the fractured bone. The question arose in this manner. Dr. Rich in response to a hypothetical question testified that the diagnosis was proper but the treatment and after care were improper according to that degree of care and skill ordinarily used and possessed by surgeons and physicians practicing in Paris, Idaho, during the years 1930, 1931, and 1932. In this question were included, among other things, the statement that in August, 1931, bed sores developed under the cast and that the doctor advised the appellant's wife to cut away the cast so as to treat them, and that three or four days after the cast had been cut away sufficiently to treat the bed sores the appellant called and without any examination other than looking at the sores remarked that they were not bad; that at the end of eight weeks the appellant directed the patient and his wife to remove the cast; that this was done without any X-ray picture taken before or after the removal of the cast; and that appellant advised the use of crutches without the taking of any X-ray picture, and on the 28th of January, 1932, appellant, without having taken any X-ray picture, directed the plaintiff to throw away his crutches and walk on his leg. The answer in response to this hypothetical question is not specifically directed to the premature use of the leg. Plaintiff asked the witness to further define the treatment which he considered improper. In response he testified concerning after treatment that no more X-ray pictures were taken, that the cast should have been removed by a licensed physician, that the physician should not have discontinued his treatment of the patient so long as the patient was having severe pain, and added, "I think it was improper to tell him to walk without a picture being taken, there being no way of telling exactly the position of the bones without a picture to show the position." Dr. Rich thus specifies that the improper treatment so far as the premature use of the limb is concerned was in allowing the limb to be used at all without an X-ray picture. He does not testify, and there is no evidence to the effect, that the use of the limb was premature, if in fact it was. There is a failure to show that the result complained of was proximately caused by the failure to take an X-ray picture, which was the only act of negligence claimed in this respect. As we have said, it is necessary not only to establish neglect on the part of a physician, but also to show that the injuries complained of resulted from that neglect. Note, 59 A. L. R. 884, page 890. It is not shown that the use of the limb was premature, and consequently no recovery can be had for the advice to use the limb in January, 1932. Moreover, even if we assume that both the initial treatment and the subsequent care of the plaintiff were negligent, there is a fatal defect in the proof because it is not shown that proper treatment would have produced a better result. Such evidence is essential in a malpractice case where two causes are co-operating to produce the final result— one, the fracture of the bone with the attendant injuries, and the other, the improper treatment. The burden is upon the plaintiff in a malpractice case to prove that the injuries he complains of resulted from the latter cause and not the former. The jury cannot be permitted to speculate upon the relative amount of injury due to the fracture and that due to the malpractice. There must be some evidence to distinguish the injury due to the fracture and that due to the appellant's negligence. It cannot be assumed that, in the absence of malpractice the result would have been better, it must be shown by the evidence of expert witnesses. The expert testimony showed that a fractured hip, in the case of a person of plaintiff's age, is very serious, resulting in death in about 15 per cent. of the cases, and that, in cases of all ages suffering from such a fracture, only about 15 per cent. fully recover; that in the balance of 70 per cent. there was functional impairment of greater or lesser degree. There is no evidence to justify the conclusion that the plaintiff belonged in the 15 per cent. of cases which make a complete recovery. His age, the proximity of the fracture to the head of the femur,

the fact that the senovial fluid contacting the fracture tends to prevent union, and the fact that he was suffering from a nervous disorder at the time of the accident all ·tend to exclude him from the percentage that make·a complete recovery. In any event it is clear that the preponderance of probability was against a perfect result in the plaintiff's case and that considerable impairment was reasonably certain to result from the injury with the best of care and medical attention.

We conclude that the plaintiff has failed to prove that he was damaged by the alleged malpractice.

The motion for a directed verdict should have been granted. It is unnecessary to consider other errors assigned.

Judgment reversed.