FRANK BOROWSKI, Plaintiff-Appellee, Cross-Appellant, *v.* CHARLES R. VON SOLBRIG *et al.*, Defendants-Appellants, Cross-Appellees.

(No. 55642;

First District (3rd Division)—September 13, 1973.

*Rehearing denied October 26, 1973.*

Harold L. Jacobson and Thomas W. Dempsey, of Lord, Bissell and Brook, of Chicago, for appellants.

Posner and Posner and Herman and Tannebaum, of Chicago, for appellee.

Mr. JUSTICE McGLOON delivered the opinion of the court:

This is a medical malpractice case in which plaintiff alleges that defendant doctor and hospital negligently treated a pre-existing leg injury suffered by plaintiff and that as a result the leg had to be amputated above the knee. After accepting a settlement from the automobile driver whose negligence produced the original injury to the leg, plaintiff pursued this cause of action against the instant defendants. After a jury trial, plaintiff was awarded a verdict of $200,000. This verdict was reduced by the trial judge to a judgment against defendants of $170,000, the amount of the reduction being equal to the sum received from the automobile driver. Defendants bring this appeal alleging a number of trial errors, among which were that the jury received erroneous instructions; that the hypothetical questions propounded to plaintiff's expert witnesses were prejudicial; and that plaintiff did not prove, to a probability, the causal connection between the alleged malpractice and the loss of the leg. Plaintiff brings a cross-appeal asking for a reinstatement of the full $200,000 judgment.

We reverse the judgment and remand the case for a new trial.

Due to the complexity of the medical testimony and the number of expert witnesses called, the trial of this cause of action lasted nearly four weeks. The report of proceedings is contained in five volumes, and the abstract is well over 1600 pages. A recapitulation of all the evidence

would cover many pages and would be unnecessary for the purpose of this opinion. Suffice it to say that we have reviewed the record in this case in the greatest detail and find the following statement of facts to be sufficient to support our decision.

On July 14, 1964, plaintiff, a pedestrian, was struck by an automobile traveling at a speed of approximately 25 m.p.h. He was severely injured and "off and on" was unconscious at the scene of the accident and while in the ambulance. Plaintiff was taken to the nearby defendant hospital where he was attended by various medical personnel, including defendant doctor. Shortly after his arrival at defendant hospital, it was discovered that as the result of the accident, plaintiff had sustained the following injuries: a badly comminuted nasal fracture; a severe crushing injury to the left leg below the knee consisting of a laceration across the leg; a compound, comminuted and displaced fracture of the left tibia with bony fragments protruding through the skin to three inches; and a compound, comminuted, impacted fracture of the head and neck of the left fibula; a comminuted fracture of the right tibia and the head of the right fibula.

Defendant doctor testified at trial that he also found, but did not enter into the hospital records, the following condition of plaintiff upon his admission: that plaintiff was shaking, cold, clammy, staring into space; he had extreme pallor and was unconscious at times and did not answer questions; the pupils of the eyes were dilated. On the basis of these findings, the doctor testified that he diagnosed, but did not record, that plaintiff was in a severe state of shock and had sustained a brain concussion with possible brain damage and possible skull fracture. He further testified that he diagnosed vascular damage to the left leg below the bifurcation of the popliteal artery into the posterior tibial and peroneal arteries.

Surgery on plaintiff's leg injuries was not performed by defendant doctor until some eight hours and 20 minutes after his admission to the hospital. The doctor testified that the delay in surgery was justified by the fact that during these eight hours plaintiff was a very poor surgical risk due to his condition of shock and possible brain damage. Plaintiff alleged that the delay was not warranted, and he produced expert witnesses who testified to that effect. Plaintiff and his wife, who was then at the hospital, testified that prior to surgery, his left leg was not immobilized and contended that this fact caused further injury to the leg during his transportation to and from various parts of the hospital. Plaintiff produced experts who testified that failure to immobilize a fractured leg could produce further injury.

Defendant doctor testified that once plaintiff's condition had stabilized

and he began surgery, he made an affirmative attempt to correct any vascular impairment to the plaintiff's left leg. He visually explored the wound and found that three to four inches of the posterior tibial artery had been obliterated. He then cleaned the wound, positioned the fractured bones and applied full leg encircling casts to both the right and left legs. He testified that he did not attempt any further repair of the left leg artery because the chances of success were nil, and he believed any further surgery at that time might have caused death to plaintiff. Plaintiff, in turn, produced expert testimony to support his allegation that the surgery as performed was improper in various respects. Plaintiff's experts testified that the doctor could not have seen the posterior tibial artery from the approach that he testified he used during the open reduction of the left leg fracture, and that the doctor should have at least obtained proximal and distal control over the artery before the cast was applied. In sum, their testimony was that the delay in surgery was not in accord with prevailing practice and caused or contributed to cause the eventual loss of the left leg.

Defendant rebutted with his own expert witnesses who testified that his treatment was within the bounds of accepted practice in the community as of July, 1964, and could not have caused or contributed to the eventual amputation.

Immediately after surgery plaintiff made strenuous and repeated complaints that the left leg cast was too tight. The hospital records indicate that over the next two days plaintiff experienced pain, swelling, discoloration and lack of sensation in the casted left leg. The full leg encircling cast was split to the site of the fracture on July 15 and removed on July 16. Plaintiff's experts testified that the use of this type of cast was not in accord with good practice and could have caused or contributed to the loss of the leg.

During the night of July 16-July 17, plaintiff was transferred to Garfield Park Hospital and placed under the care of Dr. James Benages. During the morning of July 17, he was examined by Dr. Benages who diagnosed actual gangrene in his left leg. This diagnosis was concurred in by Dr. Murphy who examined plaintiff shortly thereafter, and the left leg was amputated at a point below the knee on July 18. This operation was not completely successful in checking the spread of gangrene, and therefore a second amputation at a point above the knee was performed on August 12, 1964.

After his recovery and release from the hospital, plaintiff and his wife sued the automobile driver who struck him, Francis Paluck, and defendant doctor and hospital in a second count for medical malpractice. Before the action came to trial, plaintiff and his wife settled their claim

against the automobile driver. Plaintiff received $30,000 in exchange for a covenant not to sue running to Mr. Paluck. The pleadings were amended, and Mrs. Borowski, plaintiff's wife, and Mr. Paluck were dropped from the suit, and the action proceeded against the instant parties.

After trial the jury returned a verdict against defendants in the amount of $200,000. On motion of defendants, that judgment was reduced by the amount received as a settlement with Mr. Paluck, and judgment was entered against the defendants for $170,000.

In this appeal defendants ask that the judgment against them be reversed or that the cause be remanded for a new trial because of the many prejudicial errors committed during the trial. Plaintiff cross-appeals asking that the original judgment be reinstated.

## I

■■ The first principle of medicine, *primum non nocere*, "first, no harm to the patient," is the first principle of the law. (Kramer, The Negligent Doctor (1968).) It is found in the legal requirement that demands that those persons practicing medicine and surgery shall be duly able and careful. The purpose of this rule is to protect the health and lives of the public by making such practitioners answerable in damages to their patients for failure to employ the requisite care, skill, or knowledge in the performance of their professional duties. 61 Am.Jur.2d, Physicians, Surgeons, etc., Sec. 105.

■■ The breach of these professional duties of skill and care, or their improper performance by a physician or surgeon, whether they can be said to arise out of contract between physician and patient, or from the obligation imposed by their consensual relationship, whereby the patient is injured in body or health, constitutes actionable malpractice.

■■ The elements necessary to establish a medical malpractice case in Illinois are the same elements required of any negligence action. Plaintiff must prove: (1) that defendant owed him a duty, (2) that defendant failed to perform or breached that duty, (3) that the breach was the proximate cause of plaintiff's injuries, and (4) damages. Plaintiff must also prove that he was in the exercise of ordinary care and caution for his own safety; in other words, his freedom from contributory negligence. However, there is no suggestion that contributory negligence is an issue of this case.

We will now proceed to discuss the first three of these elements in greater detail.

(1) The duty of care required of a physician or surgeon in Illinois was established as early as 1886, and the formulation of this duty has re-

mained basically unchanged to date. In *Holtzman v. Hoy* (1886), 118 Ill. 534, 8 N.E. 832, the court said:

> "The duty which the defendant, as a physician and surgeon, owed to the plaintiff, was to bring to the case * * * that degree of knowledge, skill and care which a good physician and surgeon would bring to a similar case under like circumstances. While this rule, on the one hand, does not exact the highest degree of skill and proficiency attainable in the profession, it does not, on the other hand, contemplate merely average merit." 118 Ill. at 536, 8 N.E. at 832.

In *Schireson v. Walsh* (1933), 354 Ill. 40, 187 N.E. 921, the Illinois Supreme Court stated that because the rule is a safe one for both the public and the medical profession, it is not disposed to depart from it or to enlarge the professional requirements of a physician or surgeon. In more recent cases, a substantially similar rule has been stated. In *Gault v. Sideman* (1963), 42 Ill.App.2d 96, 191 N.E.2d 436, the court said that in actions for malpractice, the physician is held responsible for any injury resulting from a want of reasonable care, skill and diligence in his practice. See also, *Scardina v. Colletti* (1965), 63 Ill.App.2d 481, 211 N.E.2d 762.

■■ Illinois does not recognize the "schools of medicine" approach in establishing what standard of care must be used as a measure of the defendant doctor's conduct. (*Bacon v. Walsh* (1913), 184 Ill.App. 377.) However, Illinois does follow the "locality rule" under which a defendant doctor is bound to exercise such care and diligence as a good practitioner practicing in a same or similar community or hospital. *Bacon v. Walsh* (1913), 184 Ill.App. 377.

■■ (2) When the doctor fails to possess and apply the knowledge and skill and care that is ordinarily used by reasonably well-qualified doctors in similar cases and circumstances, the physician breaches his duty to his patient. Plaintiff must show by affirmative evidence that the doctor was unskilled or negligent. *Scardina v. Colletti* (1965), 63 Ill.App.2d 481, 211 N.E.2d 762.

Proof that a good result was not achieved is not proof of negligence. Plaintiff must show what the average reasonable physician in good standing would have done in a similar case and that the defendant doctor failed to conform his conduct to that norm. Proof of a bad result of a mishap is no evidence of lack of skill or negligence. *Scardina v. Colletti* (1965), 63 Ill.App.2d 481, 211 N.E.2d 762.

If the doctor has given plaintiff the benefit of his best judgment, assuming that judgment to be equal to that ordinarily used by reasonably well-qualified doctors in similar cases, he is not liable for negligence, even if

that judgment is erroneous. *Wade v. Ravenswood Hosp. Assn.* (1954), 3 Ill.App.2d 102, 120 N.E.2d 345.

(3) Plaintiff must also prove that defendant's negligence was the proximate cause of the injury. Proximate cause is best defined as that cause which in natural or probable sequence produced the injury complained of. (Illinois Pattern Instructions, sec. 15.01.) Plaintiff must show that the same result would not have followed if proper care had been used.

These are the relevant rules of law in regard to medical malpractice in Illinois that now must be applied to the facts in the instant case.

## II

Defendants' first contention is that, as a matter of law, plaintiff failed to establish the essential elements of medical malpractice. They assert that, in addition to proving the elements discussed above, it is essential to a malpractice action that plaintiff prove that proper medical treatment would have produced a better result, and that since plaintiff in the instant case offered no proof that a better result would have ocurred but for defendants' malpractice, he failed to meet this burden.

Defendants rely heavily on *Moore v. Tremelling* (9th Cir. 1935), 78 F.2d 821, to support their argument but cite no Illinois authority. Indeed, after extensive research, we find no Illinois authority to support their position.

■■ The case law in Illinois requires more than proof of a bad result, for mere proof that a good result was not obtained is, of itself, no proof of negligence or lack of skill. (*Hogmire v. Voita* (1943), 319 Ill.App. 644, 49 N.E.2d 811; *Olander v. Johnson* (1930), 258 Ill.App. 89.) "It is a well settled rule in Illinois that before a plaintiff can recover in a malpractice case it must be shown by affirmative evidence, first, that defendant was unskillful and negligent, and, second, that his want of skill and care caused the injury to the plaintiff." (*Wade v. Ravenswood Hosp. Assn.* (1954), 3 Ill.App.2d 102, 110, 120 N.E.2d 345, 348; *Lucas v. Hambrecht* (1954), 1 Ill.App.2d 226, 117 N.E.2d 306; *Simon v. Kaplan* (1944), 321 Ill.App. 203, 52 N.E.2d 832; *Olander v. Johnson* (1930), 258 Ill.App. 89; *Gault v. Sideman* (1963), 42 Ill.App.2d 96, 191 N.E.2d 436; *Anderson v. Martzke* (1970), 131 Ill.App.2d 61, 266 N.E.2d 137; *Scardina v. Colletti* (1965), 63 Ill.App.2d 481, 211 N.E.2d 762; *Dimitrijevic v. Chicago Wesley Memorial Hospital* (1968), 92 Ill.App.2d 251, 236 N.E.2d 309.) In short, it is not required in Illinois that plaintiff prove that a better result would have been obtained had there been no malpractice in order to establish a defendant doctor's liability, although it may be a relevant consideration in determining the amount of damages.

This is the better rule because it relieves courts and juries of the task

of determining what is a "better result." The facts in the instant case are an example. Plaintiff's experts testified that defendant doctor was negligent in his treatment of plaintiff, and that if he had not been negligent plaintiff's left leg would have been "saved." Were we to apply the rule suggested by defendants, we would have to ask: If there had been no malpractice and the leg was not amputated, would this be a "better result?" There was undisputed testimony that had the leg been saved, it was so severely injured in the original accident that it would not have been a functional limb, and plaintiff would have been an invalid. To bring defendants' argument down to its logical conclusion, the question then becomes whether it is "better" if plaintiff is a physically whole invalid or a relatively normal amputee. We think this presents an insoluble problem to a court or jury.

In no other negligence action is it required that plaintiff prove that a better result would have been obtained had defendant not been negligent, and there is no reason that it should be required in a malpractice action. Here, as in all other torts, it is sufficient that plaintiff prove that defendants' breach of duty caused injury and damages.

Defendants also argue in a somewhat similar vein that the judgment for plaintiff should be reversed, because plaintiff failed to prove, to a probability, that the leg would have been saved in the absence of malpractice. Plaintiff answers that he proved to a reasonable degree of medical and surgical certainty that the leg would have been saved without malpractice, citing various areas of the record containing testimony of medical experts in regard to the causal connection between defendants' acts or omissions and loss of plaintiff's leg.

■■ The great weight of authority holds that if a fair preponderance of the evidence discloses facts and circumstances proving a reasonable probability that defendants' negligence or want of skill was the proximate cause of the injury, plaintiff has supported his burden of proof sufficiently to justify a verdict in his behalf. (See, Annot. at 13 A.L.R.2d 11.) This is also the standard in Illinois; the causal connection must not be contingent, speculative or merely possible, but there must be such a degree of probability as to amount to a reasonable certainty that the causal connection exists. *Manion v. Brant Oil Co.* (1967), 85 Ill.App.2d 129, 229 N.E.2d 171; *Lauth v. Chicago Union Traction Co.* (1910), 244 Ill. 244, 91 N.E. 431.

In the instant case, plaintiff relied upon three expert witnesses to establish the causal connection between the alleged malpractice and the loss of plaintiff's left leg. Dr. James Benages testified that in his expert opinion the application of a full leg encircling cast aggravated the circulation problem in plaintiff's left leg. He also testified that based upon a reason-

able degree of medical and surgical certainty, the failure to perform diagnostic tests and take omitted therapeutic measures contributed to the loss of the leg. Dr. Charles Woodhouse testified that based upon a reasonable degree of medical and surgical certainty, the open reduction of the tibial and fibial fractures was not an efficient method of treating the vascular impairment. He further testified that in his opinion the infection in the wound coupled with the circulatory impairment contributed to the spread of gangrene, and further that the application of the cast by defendant contributed to the vascular insufficiency of the leg.

Finally, Dr. Woodhouse testified that based upon a reasonable degree of medical and surgical certainty, the leg could have been saved if treated properly. Dr. Richard Murphy testified that based upon a reasonable degree of medical and surgical certainty the delay in surgery caused or contributed to the loss of the leg. He further testified that had proper medical procedures been followed, the leg should have been saved, and that failure to do further surgery caused or contributed to the irreversible tissue damage of the leg. He also stated that the cast applied by defendant contributed to cause the loss of the leg, and further that the application of heat to the leg certainly contributed to the loss of the leg.

There is no question that the credibility of these experts and the soundness of their opinions were tested, and in same cases weakened, due to the cross-examination of the defense. However, the fact remains that none of these three witnesses changed his opinion that the treatment given plaintiff was not in accord with the proper standard of medical care that existed in the community in July of 1964 and that the treatment aggravated the preexisting leg injury so as to require amputation.

■■ A fair review of plaintiff's case indicates that he did meet that burden of establishing the causal connection between defendant's conduct, or lack of conduct, and the loss of the leg to such a degree of probability as to amount to a reasonable certainty, and therefore established that element of a prima facie case. The fact that plaintiff's experts' opinions were weakened by cross-examination and, in some cases, directly contradicted by defendants' experts does not destroy the fact that plaintiff established a prima facie case. The contradictory expert opinions created questions of fact and credibility of witnesses that were properly submitted to the jury. *Matteucci v. High School District No. 208* (1972), 4 Ill.App.3d 710, 281 N.E.2d 383.

## III

Defendants next argue that several of the jury instructions given in the trial court were erroneous statements of the law, and their prejudicial effect requires a new trial. Defendants complain of four of the instruc-

tions that were given, but for the purpose of this opinion, our discussion will center upon plaintiff's Instruction No. 8 (I.P.I. 15.01) which defined proximate cause as follows:

> "When I use the expression "proximate cause," I mean that cause which, in natural or probable sequence, produced the injury complained of. It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury."

The defendants assert that it was error to give the last two sentences of this instruction. It is contended that the jury, relying on this language, could have awarded a verdict against defendants despite concluding that the left leg would have been amputated regardless of the treatment afforded or omitted by them.

The defendants' position is that the alleged tort committed by the automobile driver, and the tort allegedly committed by the instant defendants were not joint or concurrent torts, nor did they produce a single individual injury, but rather two divisible and separate injuries. Defendants allege that the instruction allowed the jury to consider the negligence of the automobile driver as a joint or concurrent cause of the injury when, in fact, the driver and the defendants were, if anything, successive tortfeasors whose negligence did not combine concurrently but sequentially to cause injury. This, they conclude, violates the well-settled rule that the original tortfeasor is liable for the entire injury, including the doctor's aggravation, but the doctor is liable for only the aggravation proximately caused by his tortious conduct.

Plaintiff's response is two-fold. First, he contends that "by no stretch of the imagination" could the instructions complained of conceivably be said to impose liability on the defendants for the nasal fractures and right leg fractures caused by the auto driver. Although we agree with this statement, we must observe that it is not responsive to defendants' primary objections to the instruction. Plaintiff's second response is somewhat equivocal. Although stating on pages 77 and 78 of his brief that "[W]e agree wholeheartedly with defendants' repeated statements that the driver and they were not joint tortfeasors and that part of our claim was for newly created injuries * * *", he follows on page 78 with the statement:

> "In such circumstances the jury could well have believed the auto driver was responsible in whole or part for the loss of the leg. Hence, we can hardly conceive of a situation more appropriate for the instructions than this. These facts not only warranted, but demanded the giving of them [the instructions] * * *."

Despite this apparent conflict, we think the issue is fairly drawn. Is

the doctor who treats a pre-existing injury in a negligent manner, thereby aggravating the injury, jointly responsible along with the original tortfeasor for the total harm done to the patient? If he is, it was not error to give the contested instructions. If he is not, it was error to give those instructions.

■■ We conclude that, if a doctor negligently treats a preexisting injury, thereby aggravating that injury, he has committed a tort that is separate and distinct from the tort allegedly committed by the first wrongdoer, and is thus responsible only for the injury that he alone caused.

This conclusion is supported by other courts that have considered this question. In *Ash v. Mortensen* (1944), 24 Cal.2d 654, 150 P.2d 876, plaintiff was involved in an automobile accident as a result of which she suffered a fracture of the femur necessitating medical treatment from defendant doctor. She later sued the doctor for malpractice alleging that he negligently treated the fracture and thereby caused the permanent shortening and disability of the leg. The doctor defended on the ground that plaintiff had executed a release to the original tortfeasor which also released him from all liability. The court, in holding the release did not terminate the doctor's liability for his malpractice, said:

> "The independent and successive acts of Wubben and defendant doctor, differing in time and place of commission as well as in nature, produced two separate injuries and gave rise to two distinct causes of action." 24 Cal.2d 654, 657, 150 P.2d 876, 877.

In *Dickow v. Cookinham* (1954), 123 Cal.App.2d 81, 266 P.2d 63, a similar case of alleged malpractice, the court quotes extensively from *Ash* and reaches the same conclusion. Again in *Hansen v. Collett* (1963), 79 Nev. 159, 380 P.2d 301, a malpractice case, the court relies on *Ash* and concludes:

> "In support of our adoption of what is referred to as the 'minority rule' or 'the modern rule' or 'the more enlightened rule' we might have justifiably simply rested our conclusion upon the following: 'We have here two successive torts, the first by Hatch, the second by the doctor. The torts were neither joint nor concurring. They were distinct, separate and independent  *  *  *.' " 79 Nev. 159, 174, 380 P.2d 301, 308.

In *Butzow v. Wausau Memorial Hospital* (1971), 51 Wis.2d 281, 187 N.W.2d 349, plaintiff brought an action to recover from the owner and lessee of a building into which plaintiff was entering when she allegedly fell on a poorly maintained sidewalk, and a second cause of action to recover from defendant hospital which was alleged to have been negligent in its care of plaintiff for the injury sustained in the fall. In holding

that the owner and lessee of the building and the hospital were not joint tortfeasors, and therefore could not be joined because the Wisconsin venue statute required different places of trial, the court said:

"In the instant case we are not dealing with such joint tortfeasors but successive tortfeasors whose negligence did not combine concurrently but sequentially in time to cause injury. The present case is one where a subsequent tortfeasor aggravates a preexisting injury caused by the negligence of a prior tortfeasor." 51 Wis.2d 281, 285, 187 N.W.2d at 351.

Prosser reaches the same conclusion:

"If two defendants, independently operating the same plant, pollute a stream over successive periods, it is clear that each has caused separate damage, limited in time, and that neither has any responsibility for the acts of the other. The same may be true where a workman's health is impaired through the negligence of successive employers' or where there are successive assaults upon the plaintiff. In such cases there is available a logical basis for apportionment of the loss, which is lacking in the cases hitherto considered. It is possible to say, in theory at least, where one defendant's wrong left off and the other's began. As a practical matter, it may be difficult or impossible to produce satisfactory evidence as to the extent of the damages caused by each; but this is no sufficient reason for holding a defendant liable for damages with which he had no connection. The basis for division is there: it is only the evidence which is lacking. The difficulty is no greater than in cases where the plaintiff's own conduct has aggravated an injury caused by another." Prosser, Joint Torts and Several Liability, 25 Cal. L.Rev. 413, at 434-435; see also, W. Prosser, Torts, ch. 7, at 254 (3d ed. 1964).

In *Gertz v. Campbell* (1972), 4 Ill.App.3d 806, 282 N.E.2d 28, the court held that an original tortfeasor is entitled to maintain a third-party action against the treating physician, alleging malpractice, for an equitable apportionment of loss suffered by the injured party between himself and the doctor. In its opinion the court implicitly recognized the fact that in such situations the alleged wrong committed by the doctor is a separate and distinct tort.

"The fact that decisional law has held a defendant accountable to an injured party for the independent negligence of another because the first party created the risk does not establish the relationship between the original and the successive tortfeasor. For example, the converse does not follow, the second tortfeasor is not responsible to the injured party for the negligence of the

first tortfeasor. They have not acted in concert. The injuries inflicted are severable in point of time; neither has any control over or opportunity to guard against the acts of the other; the cause of action against the driver and the doctor are based upon different duties to the plaintiff, and the same evidence will not support the action against each wrongdoer; and the injury to the plaintiff is capable of being decided by apportioning the extent of the injury caused by the respective acts of negligence." 4 Ill. App.3d 806, at 810.

■■ Applying this rule to the instant case, we can only conclude that the giving of Instruction No. 8 in its entirety was error, for it allowed the jury to predicate defendants' liability on a finding that defendants and the automobile driver were jointly liable, whereas the law is to the contrary. Instructions similar to the instant one have been held to be improperly given or properly refused in a number of similar cases.

In *Murgatroyed v. Dudley* (1935), 184 Wash. 222, 50 P.2d 1025, plaintiff sued defendant doctor for malpractice alleging negligent treatment of plaintiff's infected hand. In reversing the judgment against the doctor for refusal to give a limiting instruction, the court said:

"Under the circumstances of this case, since the surgeon was not responsible or liable for the original injury, but liable only, if at all, for subsequent negligent treatment, those phases should have been carefully separated by instructions in order that the jury might not be allowed to award damages upon mere speculation and conjecture." 184 Wash. 222, 232, P.2d 1030.

In *Hall v. Bannock County* (1959), 81 Idaho 256, 340 P.2d 855, the survivors of a deceased patient sued the county-owned hospital for the alleged negligence of its staff in caring for the deceased patient after she had undergone surgery for a preexisting illness. In holding an offered instruction was properly refused, the court said:

"This instruction does not correctly state the law applicable to the issues involved. Under the offered instruction any negligent act which contributes, however slightly or to any degree, would entitle plaintiffs to *recover in full*. It ignores the legal requirement that the negligent act, relied upon for right of recovery must be the act of respondents and be an intervening, independent, responsible and culminating cause which becomes the proximate cause of the injury." 81 Idaho 256, 263, 340 P.2d 859.

Also, see *Chase v. Nelson* (1890), 39 Ill.App. 53, wherein a similar jury instruction was held to be improper under like circumstances.

The similarity of these cases with the instant case is obvious. By giving plaintiff's Instruction No. 8, the jury could have awarded a verdict

against the doctor and hospital even though they were satisfied that the left leg injury inflicted by the auto driver would have resulted in the eventual loss of that leg in any event.

Plaintiff argues further that if there was any error in the giving of Instruction No. 8, it was harmless because Instruction No. 24 stated that plaintiff should be compensated "for any of the following elements of damage proved by the evidence to have resulted from the negligence of the defendants \* \* \*." We disagree with the plaintiff's contention because Instruction No. 24 restricts the *damages* to that caused by defendants' negligence, but only after, as Instruction No. 24 itself states, the jury had determined defendants' *liability* for these damages by using an erroneous instruction. Instruction No. 24 regarding the amount of damages could not cure the possible error that defendants may have been adjudged liable for an injury they did not proximately cause.

## IV

There was further error during the trial of this action. In Point III of their brief, defendants argue that the hypothetical questions presented to plaintiff's expert witnesses were so prejudicial as to require a new trial. Defendants present a number of reasons why the hypothetical questions were prejudicial, and among these are their allegations that (1) portions of each question were repetitious, and (2) the questions included irrelevant facts. Plaintiff, in response, argues that defendants have waived their right to object to the questions because they did not do so in the trial court and that in any event the form and content of the hypotheticals were proper.

In response to plaintiff's contention that defendants failed to preserve this issue for review, we need only point out that the record shows that defendants made numerous objections after each of the hypotheticals were propounded and, specifically, defendants objected to the fact that the questions, when considered as a whole, were so prejudicial as to require a mistrial. These objections were sufficient to preserve this issue on appeal.

■■ It is difficult to prove all but the most simple cases of medical malpractice without the testimony of expert witnesses. Generally, the critical portion of this testimony is elicited through the use of hypothetical questions for it is the purpose of a hypothetical question to obtain an opinion, upon a subject not within the knowledge of men of ordinary experience, of one who by a previous course of habit or study has acquired a knowledge of that subject. (*Clifford-Jacobs Forging Co. v. Industrial Com.* (1960), 19 Ill.2d 236, 166 N.E.2d 582.) Further, it is universally required to use a hypothetical question in order to allow an ex-

pert witness to express his opinion where the premises upon which he bases that opinion are not supplied by the witness himself. (2 Wigmore, Evidence 797, sec. 676 (3d ed. 1940).) The premises upon which the expert opinion is based must be brought out in some way, and if the expert witness cannot himself supply them by details of his own observation, they must be presented hypothetically. (2 Wigmore, Evidence 798, sec. 676 (3d ed. 1940); *Sherman v. City of Springfield* (1966), 77 Ill.App.2d 195, 222 N.E.2d 62.) However, this is not to say that an expert witness must base his testimony only on the data presented hypothetically, for no harm is done if the expert has had some personal observation of the incident he is asked to testify about. 2 Wigmore, Evidence 798-99, sec. 678 (3d ed. 1940); *Danielson v. Elgin Salvage & Supply Co.* (1972), 4 Ill.App.3d 445, 280 N.E.2d 778; *Richards v. Village of Edinburg* (1968), 97 Ill.App.2d 36, 239 N.E.2d 479.

In the instant case, the three hypothetical questions propounded to plaintiff's experts were of exceptional length. The hypothetical question asked of plaintiff's expert Dr. James Benages covered 54 pages of the report of proceedings, the question asked of Dr. Woodhouse covered 49 pages, and the hypothetical asked of Dr. Murphy covered 76 pages. The severity of plaintiff's injury and the complexity of the medical testimony relating to his claim of malpractice necessitated lengthy hypothetical questions. Certainly the mere length of a question of itself is no objection. (2 Wigmore, Evidence 812, sec. 685 (3d ed. 1940).) However, in this appeal defendant raises certain objections to the content of these questions which are well founded.

First, the questions as phrased were unduly repetitious in regard to a number of specific facts in evidence. An important element in the theory of plaintiff's case was the fact that certain medical findings that defendant testified he made when he examined plaintiff were never recorded by him in the hospital records. However, counsel repeated this fact so often that the potential prejudice this emphasis caused cannot be ignored.

In the hypothetical addressed to Dr. Benages, at page 629 of the report of proceedings, plaintiff's counsel stated, "[W]hen the doctor first sees this man, according to him, it is in the emergency room and he says that he found, but did not record, various symptoms compatible with shock * * *." At page 630 appears, "The attending man says that not only were symptoms of shock not recorded they were not treated." At page 650 appears, "* * * he found in the emergency room but did not record in the hospital records * * *." At page 651 appears, "These findings, the doctor says, are all crucial, vital, gross, significant findings and do not appear either in the hospital record or * * *." At page 652 appears, "Neither the shock or the self-stabilization appear in the

hospital record as such." At page 658 appears, "Assume further that despite his unrecorded opinion that this man was a poor surgical risk, an opinion which he says he formulated immediately but did not record * * *." At page 661 appears, "* * * he found the following things that he did not record * * *."

In regard to another aspect of plaintiff's case, the failure to immobilize plaintiff's left leg prior to surgery, plaintiff's counsel repeated the following, all found in the question to Dr. Benages: at page 615, "His leg is not at that time immobilized and his leg at that time is not bandaged"; at page 616, "The leg at that time was not bandaged or immobilized * * *"; at page 618, "He is taken from the emergency room with his left leg not immobilized * * *"; at page 619, "Assume further that in the course of his movements, without his left leg being immobilized * * *"; at page 621, "* * * the wound remains immobilized * * *"; at page 630, "There is no mention of nor does the attending man say that the left leg was immobilized by a pillow splint or otherwise"; at page 647, "The attending physician did not make use of temporary means to immobilize the leg * * *".

These serve as an example and are not the only instances found in the record. Other facts in evidence that were also repeated in each hypothetical question were: the fact that there was no recordation of an absent leg pulse prior to surgery; the fact that no wound culture was taken during plaintiff's stay at defendant hospital; that defendant did not request consultation prior to surgery; and that plaintiff was allowed to self-stabilize from his condition of shock without the use of any medication specifically prescribed for that condition. These facts were unnecessarily repeated in the hypotheticals but not with the same, frequency as those facts we have set out above.

Examples of the same prejudicial repetition are found in the hypotheticals asked of Drs. Woodhouse and Murphy, although the frequency of the repetition is not as great as is found in the first hypothetical asked of Dr. Benages.

A second category of defect found in the hypothetical questions is that they contain irrelevant information that should not have been included. In the hypotheticals propounded to his experts, plaintiff included the fact that in March, 1964, the hypothetical doctor had written and published an article in the "Chicago Fire Fighters" magazine which recommended medical treatment in regard to the reduction of fractures that was, arguably, at odds with the medical treatment given to the hypothetical patient. Counsel also included in all his hypotheticals the statement that the hypothetical patient's wife was sent home from the hospital in order to make financial arrangements to secure her husband's

admission. These facts, although conceivably important to another part of plaintiff's case, could have no conceivable value as part of a hypothetical question to an expert witness who was to testify about the quality of medical treatment afforded the hypothetical patient. *Sanitary District of Chicago v. Corneau* (1912), 257 Ill. 93, 100 N.E. 517.

The question also contained the statement that an unlicensed doctor treated the hypothetical patient. However, this fact was never proved and the statements regarding the unlicensed doctor were not stricken until after the hypotheticals were given and the expert opinions rendered. Defendants also point out that certain statements that plaintiff included in the first hypothetical were objected to and sustained by the trial judge, but nevertheless were included by counsel in the second and third hypotheticals propounded by him, thereby causing defendants to object to the inclusion of these statements a second and third time. Since these statements of fact were successfully objected to after the first hypothetical and there was no new evidence adduced between the hypotheticals that made these statements relevant or supported by proof, they should not have been included in the subsequent questions.

■■ Finally, in regard to the hypothetical questions, defendants argue that it was error for the trial judge to allow plaintiff to include in his hypothetical question to one expert the expert opinion of other witnesses, alleging that this contravened the requirement that expert opinion be based upon facts. It is well settled that expert opinions must be based upon facts and not opinions of other persons. However, the law does allow an exception where the included opinion or diagnosis is "within the realm of direct or circumstantial evidence as shown by the facts or reasonable inference." (*Horwitz v. Michael Reese Hospital* (1970), 5 Ill.App.3d 508, 516, 284 N.E.2d 4, 9; *Handge & Son v. Industrial Com.* (1965), 33 Ill.2d 201, 206, 210 N.E.2d 498, 501.) Therefore, the inclusion in a hypothetical question addressed to an expert witness of the opinions of other experts or the previous diagnosis made by the testifying expert when he was the treating physician is not necessarily error, but repetitious use of this practice with several expert witnesses is objectionable.

## V

We shall also comment here on the contentions raised in plaintiff's cross-appeal. After the jury returned a verdict for plaintiff in the amount of $200,000, the trial judge, on defendants' motion, reduced the verdict by $30,000 which was the amount plaintiff received from the auto driver in exchange for a covenant not to sue running to the original tortfeasor. Initially, we would point out that since we are remanding this case for a new trial, ordinarily there would be no need to decide the issues raised

in the cross-appeal. However, we find it is necessary to briefly comment on the reduction of the jury verdict.

Since we have determined that the cause of action against the doctor and the cause of action against the auto driver are separate and distinct causes, each resting on its own elements of causation, if plaintiff had received a verdict against the doctor by using proper instructions, it would then have been improper to reduce that verdict by the amount received from the original tortfeasor. The plaintiff would have received two recoveries for two separate causes of action, and the reduction of one by the amount received from the successful conclusion of the other could not be sustained on any logical theory. Plaintiff would not have been compensated twice for the same injury because the recoveries would have represented compensation for two separate injuries.

In conclusion, we find that due to the erroneous jury instructions and the defects in plaintiff's hypothetical questions, the judgment of the circuit court is reversed and the cause is remanded for a new trial.

Judgment reversed; cause remanded.

McNAMARA and STAMOS, JJ., concur.