(No. 81-CC-1473–

RITA GORDON and VINCENT GORDON, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Opinion filed Jan. 31, 1995.*

GOLDBERG & GOLDBERG (BARRY DAVID GOLDBERG, of counsel) for Claimants.

JIM RYAN, Attorney General (RICHARD KRAKOWSKI, Assistant Attorney General, of counsel), for Respondent.

## OPINION

FREDERICK, J.

Claimants, Rita and Vincent Gordon, filed their complaint in the Court of Claims pursuant to section 8 of the Court of Claims Act seeking recovery for personal injuries. (705 ILCS 505/8(d).) The claim by Claimant, Rita Gordon, against Respondent is a medical negligence claim arising out of acts, or omissions, alleged to have been performed by the Illinois State Psychiatric Institute, which caused her to incur personal injuries. The claim by Claimant, Vincent Gordon, is for loss of consortium.

Facts

The Claimants, Rita and Vincent Gordon, are wife and husband. They have been married since October 9, 1976. In 1979, Mr. and Mrs. Gordon were both employed. Mr. Gordon was a janitor for the Chicago Housing Authority and Rita Gordon was a case worker I for the Illinois Department of Public Aid. The Claimants enjoyed a normal, healthy marital relationship. Their four children lived with the Gordons in 1979 and Rita had the primary responsibility for maintaining the household.

Prior to January 1979 Rita Gordon had enjoyed good health. She had never suffered from any significant illness, and she had never been treated for a psychiatric condition.

In January of 1979 Mrs. Gordon began exhibiting bizarre behavior. She would talk incoherently and emotionally. One night she obtained a knife because she thought someone was out to get her. After demonstrating bizarre behavior at home, including hearing voices, Rita Gordon was admitted to Respondent's Illinois State Psychiatric Institute on January 14, 1979. After being involuntarily admitted, she laid lifeless and made no utterances or responses. She was diagnosed as an acute schizophrenic. During this hospitalization, Rita Gordon became stuporous, failed to recognize people, developed a fever and progressed to a coma. Mrs. Gordon did not undergo any laboratory studies to work up the cause of her illness. More specifically, she never had a white blood cell count nor a spinal tap. It appears a white blood count was ordered but no result appeared in her medical chart.

On January 20, 1979, Mrs. Gordon was transferred to Rush Presbyterian St. Luke's Medical Center. At that time she came under the care of Dr. Harold Klawans. Dr. Klawans diagnosed Rita Gordon as suffering from viral

encephalitis. The diagnosis was confirmed by a spinal tap. During this hospitalization, Mrs. Gordon was treated with Arabinoside-A for the viral encephalitis. She also underwent paraperitoneal dialysis for altered kidney function and had a tracheostomy to provide support. Dilantin and Phenobarbital were prescribed to treat seizures.

The only medical witness to testify was Dr. Harold Klawans. Dr. Klawans is a board certified neurologist. Dr. Klawans testified that viral encephalitis is an inflammation of the brain caused by a virus. The signs and symptoms of viral encephalitis include fever, apparent psychiatric manifestations, followed by a depressed level of consciousness, lethargy, stupor, coma and seizure. Dr. Klawans further testified that the diagnostic modalities used to rule viral encephalitis in or out in 1979 included temperature, white blood cell count, and a spinal tap. He also testified that viral encephalitis was treated with the drug Arabinoside-A.

Dr. Klawans reviewed the Illinois State Psychiatric Institute records pertaining to Rita Gordon. It was the opinion of Dr. Klawans that the physicians at the Illinois State Psychiatric Institute deviated from the standard of care in treating Rita Gordon in the following respects:

(a) By failing to obtain a white blood cell count for Rita Gordon;

(b) By failing to re-evaluate Mrs. Gordon several days after her admission when she developed a stiff neck and became lethargic;

(c) By failing to perform a neurologic evaluation; and

(d) By failing to perform a spinal tap.

Dr. Klawans also testified that the standard of care required that the foregoing be performed by the physicians at Illinois State Psychiatric Institute.

Finally, Dr. Klawans testified that the deviations from the standard of care caused injury to Rita Gordon. Dr. Klawans testified that Mrs. Gordon's disease was allowed to progress to a much more severe state prior to its diagnosis and it made her medical course more complicated. She required renal dialysis and a tracheostomy for respiratory care and she sustained short-term memory loss. Dr. Klawans testified that earlier treatment would have spared Mrs. Gordon a coma and that earlier treatment could have prevented Mrs. Gordon's anterior compartment syndrome.

After the hospitalization, Mrs. Gordon continued to receive outpatient physical occupational therapy for six to eight months. She has permanent scars from the tracheostomy and treatment for the anterior compartment syndrome. She did not return to work until March 17, 1980. The Claimant's medical bills amount to $70,589.95.

Mrs. Gordon has no memory of her treatment at the Illinois State Psychiatric Institute. She does not engage in strenuous work at home. She has lost the desire for sex and her frequency of intercourse has diminished from three to four times a week to once or twice a month.

The only evidence presented by the Respondent was the introduction of Mrs. Gordon's Illinois State Psychiatric Institute record. The Respondent called no physicians to dispute the standard of care, whether Respondent deviated from the standard of care, or whether the deviations were a proximate cause of Claimant's injuries.

Immediately prior to the commencement of the hearing and before any evidence, the Respondent moved orally and inartfully for a directed verdict stating that the case was barred by the doctrine of *res judicata*. Claimants had previously filed a medical malpractice complaint in the circuit court of Cook County in *Gordon v. Nasr*

(1989), 182 Ill. App. 3d 964, 538 N.E.2d 483. The circuit court ultimately granted summary judgment in favor of defendants. Claimants sued 32 defendants in the circuit court action. The Claimants appealed the decision to the first district appellate court. The appellate court affirmed the circuit court's decision. *Gordon v. Nasr* (1989), 182 Ill. App. 3d 964, 538 N.E.2d 483.

Claimants objected to Respondent's motion for directed verdict based upon timeliness. Claimants also objected because the motion was not stated in writing and thus did not provide them with a fair opportunity to respond. Claimants argue that the circuit court never obtained jurisdiction over Dr. Nasr, therefore the summary judgment could not have been a decision on the merits as it relates to his conduct.

Respondent's position is that Dr. Sudahyl Nasr and 31 other individuals were named defendants in the circuit court case. Respondent argues that the State, as a principal, acts as an indemnor of its agents. Respondent argues that the disposition of summary judgment is a disposition on the merits of the case.

Respondent may be correct that if the circuit court found Respondent's agents to be without fault, then Respondent would escape liability, but in this instance, it appears that the circuit court did not have jurisdiction over all of the alleged agents of the State, including Dr. Sudahyl Nasr. The appellate decision indicates that, "only 16 defendants were remaining at the time the orders appealed from were entered." (538 N.E.2d 484.) The appellate decision does not state whether Dr. Nasr was one of the remaining defendants, therefore it cannot be determined whether summary judgment was entered in favor of Dr. Nasr. Claimants' reply brief names Dr. Nasr and 11 other individuals which were not subject to the summary judgment order.

Respondent has not disputed the assertion that Dr. Nasr was not a subject of the summary judgment order. Additionally, the affidavits relied upon by the circuit and appellate courts are not offered into this record and there is no indication what the exact statements of those affiants may contain. The Respondent failed to present enough evidence to the court to determine if the motion should have been granted.

It may be that the State should have argued that the cause should have been dismissed for failure of the Claimants to exhaust their other remedies. (Court of Claims Regulations, 74 Ill. Adm. Code, 790.60, 790.90.) This Court could find that the Claimants' failure to follow Supreme Court Rule 220 against some of the defendants in the State court proceeding is a breach of Claimants' duty to properly exhaust their remedy.

The Court's problem is trying to determine the status of those defendants for which the circuit court did not have jurisdiction. If the 32 defendants were State employees, acting within the scope of their employment, then the State does not have an exhaustion of remedies defense. (See 24—5 Court of Claims Act, 740 ILCS 45/1, *et seq.*). However, if Dr. Nasr and the 11 others not subject to the summary judgment order were not State employees then there would be a defense for failure to exhaust other remedies for recovery.

There is no evidence that the Court can point to before the Court from which this Court can determine the employment status of those 12 State court defendants by a preponderance of the evidence. Therefore, the *res judicata* defense and the potential exhaustion of remedies defense must be denied.

Claimants have presented a *prima facie* case of medical negligence and the Respondent failed to rebut any of

that evidence. Respondent did not present any witnesses. Respondent only offered into evidence the records from the Illinois State Psychiatric Institute.

The Respondent, by its physician employees, owed a duty to Claimant, Rita Gordon, to possess and apply the knowledge, skill and care that is ordinarily used by reasonably well-qualified doctors in similar circumstances. In order to prove medical malpractice, the Claimants had to prove that Respondent breached its duty and the breach was a proximate cause of injury. *Borowski v. Von Sobbrig* (1973), 14 Ill. App. 3d 672, 303 N.E.2d 146, 150.

Claimants presented Dr. Harold Klawans, a treating physician of Rita Gordon and a board certified neurologist. Dr. Klawans testified that he cared for Rita Gordon while she was a patient at Rush Presbyterian St. Luke's in 1979. He played a role in the diagnosis of Mrs. Gordon and the determination of her treatment. He diagnosed her, based upon clinical features and spinal fluid, as having viral encephalitis. Dr. Klawans stated that the condition could cause loss of memory and it is common for such patients to go into a coma. Dr. Klawans testified that the physicians and attendants to Rita Gordon at the Illinois State Psychiatric Institute deviated from the required standard of care. His interpretation of the medical records is that no white blood count was conducted, and if it was conducted, there is no mention of the results. He opined that several days after admission, when she developed a stiff neck, which is often a suggestion of inflammation going on within the central nervous system and was lethargic, she should have been completely re-evaluated.

Respondent cites *Ondes v. State* (1991), 43 Ill. Ct. Cl. 272 in support of the proposition that Claimant must show by a preponderance of the evidence that the injury was reasonably foreseeable, the likelihood of injury, the

magnitude of the burden of guarding against it, and the burden on the State to guard against the injury. *Ondes* is not a medical malpractice case.

Respondent argues that after tests were run, physical exams given and notes made, Mrs. Gordon was diagnosed as suffering from acute schizophrenia. Further tests were to be conducted during her stay between January 17 and January 20, 1979, but Mrs. Gordon was recalcitrant and uncooperative. Respondent also states that her illness did not appear to be life-threatening.

All of the above circumstances, according to Respondent, would make it extremely difficult for anyone to reasonably foresee the likelihood of injury. Respondent notes that, "as soon as it was determined that Rita Gordon spiked a high fever of 104 degrees, she was immediately transferred to Rush Presbyterian St. Luke's Hospital after consultation with her family." Respondent concludes that an injury was not foreseeable since a creation of a legal duty to a claimant requires more than a mere possibility of an occurrence. *Cunis v. Brennan* (1974), 56 Ill. 2d 372.

The problem with all of the State's arguments is that the State presented no expert witnesses to support its arguments. All the State presents are arguments unsupported by testimony. As the Claimant presented a *prima facia* of medical negligence which Respondent failed to rebut with expert testimony, we must find that the Respondent owed a duty of care to care and treat Claimant within the standard of care of reasonably well-trained medical providers in similar circumstances in similar localities; that the Respondent breached that standard of care by failing to diagnose the viral encephalitis through appropriate diagnostic modalities; and that this breach was a proximate cause of Claimant's injuries.

Claimant's Exhibit No. 1 is a statement of account indicating that $63,745.75 in medical costs had been charged by Presbyterian St. Luke's Hospital as of April 24, 1979. Claimant's Exhibit No. 2 indicates that a total of $70,589.95 in medical expenses were incurred. Mrs. Gordon did not return to her job at the Illinois Department of Public Aid until March 17, 1980. Claimant testified that she was earning approximately $800 per month. Unfortunately, Claimant's Exhibit No. 3, an employment record which was used to refresh the witnesses' recollection, was not offered into evidence. Therefore, there is no verification of earnings. However, Mrs. Gordon did miss nearly 14 months of work.

The issue of damages is a difficult one because there is no allegation or proof that Respondent was in any way responsible for Mrs. Gordon's viral encephalitis. Instead, it is alleged that the misdiagnosis caused her condition to become more extreme and complicated. It is not absolutely clear whether Mrs. Gordon would have experienced the renal dialysis and a tracheostomy for her respiratory care had the viral encephalitis been diagnosed and treated any time prior to January 20, 1979. Dr. Klawans testified that Respondent deviated from the standard of care which allowed Mrs. Gordon's disease to progress to a much more severe state. This made it more likely that she would require a tracheostomy and renal dialysis. It was more likely it would take her longer to recover. She experienced six or seven months of therapy. She also has scars from the tracheostomy.

The Court finds that the total value of Claimant Rita Gordon's claim is forty-five thousand dollars ($45,000). The Court finds that the total value of Claimant Vincent Gordon's claim for loss of consortium is two thousand five hundred dollars ($2,500). No specific sum was requested

by Mr. Gordon and although there is some testimony to loss of consortium, the loss appears to have been temporary.

Wherefore, it is ordered that the Claimant, Rita Gordon, be and hereby is awarded the sum of forty-five thousand dollars ($45,000) and Claimant, Vincent Gordon, be and is hereby awarded the sum of two thousand five hundred dollars ($2,500).